**PALMER et al. v. PALMER et al.**

No. 218.

Circuit Court of Appeals, Second Circuit.

May 8, 1939.

Robert G. Dodge, of Boston, Mass., Oscar M. Shaw, Sp. Counsel, of Boston, Mass. (R. Ammi Cutter and Allen O. Eaton, both of Boston, Mass., of counsel), for appellants.

Hermon J. Wells, of New Haven, Conn. (J. H. Gardner, Jr., and Herbert H. Corbin, both of New Haven, Conn., of counsel), for appellees.

Before L. HAND, SWAN. and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

### The Recovery of the Rentals and the Operating Deficit.

This appeal concerns the allowance of certain items in an account, filed by the trustees in reörganization of the New York, New Haven & Hartford Railroad Company with themselves, as trustees in reörganization of the Old Colony Railroad: it will be convenient to speak as though the two roads, instead of their trustees, were the parties concerned. The first item in dispute is a debit against the Old Colony for rentals, paid between October 23, 1935, the day on which the New Haven filed its petition for reörganization under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and June 3, 1936, that on which the Old Colony did the same thing. The Old Colony had let its property to the New Haven in 1893, at a rent made up of a fixed dividend upon its shares, the interest upon its funded debts, and the taxes which might become due upon its property. In the original order which approved the New Haven's petition for reörganization, the district judge directed the trustees to pay "such sums as may be necessary to comply with the obligations of the debtor under contracts or leases", and by virtue of this authority they did pay the rent due under the lease, while they were considering whether to adopt the term. On June first, 1936, they rejected it, and, as we have said, the Old Colony went into reörganization on June third, being altogether unable to operate its railroad alone: during the whole period it had been running at a heavy deficit. The New Haven now insists that the rentals paid, and the deficit incurred since October 23d, 1935, be debited against the Old Colony

and that both items rank ahead of its bondholders. On November 30th, 1935, after only one installment of that rent had been paid (the interest due upon the Old Colony bonds on December 1, 1935), the judge passed a second order that, in case any leases were eventually rejected, the "payments shall be deemed to have been made for the account of the lessors and such payments shall be recovered, set-off, or made and charged on the earnings and/or properties of the lessors prior to any mortgage or other lien thereon". This second order was served upon the president and attorney of the Old Colony, but at just what time they learned of it, does not appear, though it must of course have been after November 29th when the first installment of rent was paid. Although the Old Colony accepted all later payments without reservation, it now disputes that they are either debits against it in the account, or, if debits at all, that they are prior to the lien of its bondholders.

A lease, being property cum onere, does not pass to a trustee in bankruptcy, unless he adopts it. Copeland v. Stephens, 1 Barn. & Ald. 593; Ex parte Houghton, Fed.Cas.No.6,725, 1 Low. 554; In re Frazin, 2 Cir., 183 F. 28, 33 L.R.A.,N.S., 745. Yet if the question were to arise for the first time, it would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reëntry. While such ad interim payments need not, and of course would not, constitute an adoption of the term, insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee. This necessity should be in no sense affected by the fact that the property may be a railroad, which must in any event be operated, even when as here the lessee alone can operate it. The question does not concern the public, but is a dispute between two groups having interests in the property: it involves only the adjustment of their mutual claims upon it. Nevertheless, the contrary has been generally held; and the trustee's adoption of the term is said to "relate back" to the beginning of the proceeding, or at least to adjudication. The reason for this is not clear. It does not follow from § 70 of the Bankruptcy Act, 11 U.S.C.A. § 110, which vests the trustee's title only "by operation of law"; for title to the term vests, not by operation of law at all, but only by the trustee's adoption. Be that as it may, the trustee need not pay the rent during the probationary period, and the court will hold off the lessor, and force him to be content with the value of the use and occupation meanwhile, though ordinarily it will fix that at the same amount as the rent. This was the result in Quincy, etc., R. Co. v. Humphreys, 145 U.S. 82, 12 S.Ct. 787, 36 L.Ed. 632, and in United States Trust Co. v. Wabash Railway, 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085, though so many other circumstances were thought relevant that we are not clear as to the precise scope of either ruling. But we have ourselves a number of times declared that the trustee's title "relates back", or that he is liable only for use and occupation, and in some instances what we said was necessary to the result. In Re Frazin, supra, 183 F. 28, 32; In re Sherwoods, 2 Cir., 210 F. 754, Ann.Cas.1916A, 940; Johnson v. Emerson Phonograph Co., 2 Cir., 296 F. 42, 45; Heineman Corp. v. Levy & Co., 2 Cir., 6 F.2d 970, 975; In re United Cigar Stores Co., 2 Cir., 69 F.2d 513, 515; Central Manhattan Properties v. D. A. Schulte, 2 Cir., 91 F.2d 728, 730. Whether justified in principle or note, the doctrine has by now become too well fixed to be uprooted, especially since no change was made when the whole subject was overhauled in the Chandler Act.

Strictly it might follow that when a receiver, or reorganization trustee, continues to pay rent during the probationary period without condition, the payments are voluntary, and he cannot recover them, though in the end he rejects the term. We have considered the question three times, and the results were not harmonious. In Pennsylvania Steel Co. v. New York City Railways Co., 2 Cir., 198 F. 721, 725–734, we allowed the receiver to recover on the theory that the lessor might have applied to the court to oust him, and that as it did not, we should assume that it was content to let him remain, subject to an eventual "relation back", if he rejected the term. Yet by hypothesis it would have been impossible for the lessor to recover possession, because the receiver's delay had not been unreasonable; a futile assertion of its discontent should not have been a condition upon its rights. The situation came up a second time in Second Avenue Railroad Co.

164

v. Robinson, 2 Cir., 225 F. 734, where we took precisely the opposite position, denying any recovery to the receiver. Again we assumed that the lessor might have demanded possession, though the probationary period had not been unduly long; but this time we drew the opposite inference from that premise. The third case was Westinghouse, etc., Co. v. Brooklyn R. T. Co., 2 Cir., 6 F.2d 547, which strictly did not present the precise question, because the property had earned more than the rent paid. But we were clearly dissatisfied with the result in Second Avenue Railroad v. Robinson, supra, our whole opinion being directed towards limiting its general application. It so happens in the case at bar that the issue is important only as to the interest paid to the bondholders on November 29th, 1935, because the Old Colony had express notice by service of the order of November 30, 1935, that all later payments were conditional, and might be revoked, in case the trustees rejected the term. That certainly prevented their being voluntary, and made them recoverable, for the Old Colony upon rejection was entitled only to the value of use and occupation. But that aside, it seems to me that ordinarily at least the more consistent doctrine is not to require any such express notice to the lessor, but to say that from the very outset, dealing as he does with a receiver, he is charged with notice of the provisional character of all transactions between them. If he is relieved of liability, it is only because it would be inequitable to compel him to restore what he did not know he might be called upon to restore, when he received it; and there may indeed be cases of individual lessors who have so far adjusted their affairs in actual ignorance of the contingent nature of the payments, that it would be unfair to compel them to do this. We need not lay down an inflexible rule; for here, at any rate, such considerations are inappropriate. If the Old Colony retains even the first payment, it will merely be allowed to hold what it has no right to under the doctrine of "relation back."

 We cannot however see how any of the rentals can be put ahead of the bondholders' lien. The order of November 30th, 1935, could not change the priorities ex proprio vigore, for the Old Colony and its bondholders were not then parties to the proceeding. If the bondholders had received personal notice of the terms of the order, perhaps their acceptance of the interest on their bonds might have been a surrender pro tanto of their lien; but they are not shown to have had notice. True, anyone dealing with the officer of a court is charged with notice of limitations upon his authority, but the trustees had authority to make the payments. We should have to go further, and say that they were chargeable with notice of consequences which the order attempted to impose upon their acceptance. There is no authority for that. Moreover, as to payments to any one but themselves—to the shareholders for example—we cannot perceive a shred of reason for postponing them. It is otherwise as to the deficit. The payments which made up this were by hypothesis necessary to run the road, and therefore to the continued existence of the Old Colony's franchises. If evidence of this necessity is needed, it may be found in the fact that since the rejection of the lease the New Haven has continued at the Old Colony's request to operate the road under § 77(c) (6), 11 U.S.C.A. § 205(c) (6). The disbursements were therefore recoverable unless they were voluntary, which they were not; because, if the trustees eventually adopted the term, they needed an operating road; while if they rejected it, they were bound to turn it over in the same condition. Moreover some at least of them had precedence over the Old Colony's bondholders. The New Haven was entitled to be subrogated to the claims of those who supplied the goods or furnished the services, and that right included whatever security these claimants would have had. Upon this record we cannot decide how much of the deficit is made up of such claims; the division will follow the general doctrine applicable to the situation. Miltenberger v. Logansport Railway Co., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117; Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717. In Morgan's Co. v. Texas Central Railway, 137 U.S. 171, 11 S.Ct. 61, 34 L.Ed. 625, the person defraying the expenses was under no duty to keep the road in operation. But although we cannot for this reason separate the deficit in kind, we can, and do, hold that the New Haven's priority should not be limited to such claims as were paid within six months before June third, 1936, the date of the Old Colony's petition for reorganization. It is true that if the creditors themselves had not collected their claims within that time, their own priority would have been lost; but if we were similarly to limit the New Haven's right of subrogation, the result would be practically to impair

its privilege of election. For if any payments more than six months old are made on a lessee's own account, save as it shares with general creditors, it can never safely delay beyond that period, however fair it may be that it should. We hold therefore that for all rents paid and for operating disbursements the New Haven has a general, though not a prior, claim; and that for all disbursements making up the deficit it has a claim prior to the lien of the bondholders, to the extent that the claims paid would have been prior to that lien, if they had been incurred within six months of petition filed.

### The "Segregation Formula".

On October 7, 1937, the trustee of a mortgage upon the New Haven filed a petition, alleging among other things that a formula had been prepared, equitably dividing the joint rates for traffic over the New Haven and Old Colony. On this petition the court on October 29th found that it was necessary to make some segregation of "earnings and expenses as between and to the divisions and parts of the railroad system under the administration of this court in this proceeding which are separately subject to the liens of the various mortgages or are or were separately subject to lease". For this reason it ordered that the formula should be sent to the Interstate Commerce Commission for "its recommendation as to the method or formula by which the segregation and allocation" should be made. After several hearings, at which the Old Colony appeared and presented its objections, the Commission on April 15, 1938, reported back to the judge that it understood its duty to be to recommend a "formula that will permit the ascertaining * * * of the earnings * * * of each mortgaged and leased line operated as an integral part of the debtor's system", but that its recommendation was not to be understood "to express any views with respect to the use of the results obtained". Thereafter it discussed at length the various considerations which it deemed controlling, and concluded that "the trustees" method of segregation and allocation of the debtor's revenues and expenses between its various mortgaged and leased lines is as fair and reasonable as the circumstances will permit." This report was confirmed on May 25, 1938, by an order from which no appeal was taken. In the accounting the rates were divided in accordance with the formula, but the Old Colony protested and offered evidence, looking towards another method more favorable to itself. Its position was, and is, that the formula was made on the assumption that the Old Colony had remained a part of the New Haven, although in fact it had not, because by the rejection of the term it became a separate road, in spite of its continued joint operation under § 77(c) (6). It argued that the Commission was bound to divide the rates under § 15(6) of the Interstate Commerce Act, 49 U.S.C.A. § 15(6), and had failed to do so, as its reports showed, because it had treated the Old Colony as still a leased road. The Commission should have favored it, as a weaker, separate road, in dividing the rates, and the evidence it offered was to enable the judge to do so. The evidence was excluded, and the accounts were settled upon the basis of the Commission's report.

■ Section § 77(c) (6) of the Bankruptcy Act, 11 U.S.C.A. § 205(c) (6), provides that when it is "impracticable and contrary to the public interest for the lessor to operate" a rejected line, the judge may upon the lessor's petition direct the lessee to continue its operation. Section 77(c) (10) provides that the judge "may refer to the Commission * * * the * * * formula by which such segregation * * * shall be made"; that is a segregation of "the earnings and expenses between * * * parts of the railroad * * * separately subject to lease". If a reference to the Commission under this section was proper at all, we need not decide whether the Commission was bound by § 15(6) of the Interstate Commerce Act. (It should in any event be noted in passing that § 15(6) is merely a procedural implementation of § 1(4), and that § 1(4)—primarily at any rate —applies to roads under separate management). We need not so decide, because if the Commission had jurisdiction, the Old Colony was bound to submit its evidence to it, and at that time to secure from it a proper recognition of its privileges under § 15(6). It could not later ask the district court to take these up as an original question. Thus, the only thing open to us now is whether § 77(c) (10) covers a case where the court has continued the original joint operation of a leased road under § 77(c) (6), after the lease has ended. Literally, it is true, the section does not cover the case, but we think it should nevertheless be understood to do so. If not, the court will lose the advantage of the Com-

mission's guidance upon a·matter peculiarly within its province, although the situation is to all practical purposes the same as though the putative term still continued in existence. By hypothesis the situation is practically the same as it was before. Furthermore, we do not see how the district court could in any event proceed of itself: § 15(6) of the Interstate Commerce Act gives power to divide rates only to the Commission; and the sole alternative to the course taken here would seem to have been an independent proceeding between the two roads under that section. We conclude, therefore, that as to this item the order was correct.

#### The Charge of Interest and Taxes against the Old Colony's share in the Terminal.

The Old Colony during the period in question was the lessee of the Boston & Providence Railroad, and the Boston & Providence had owned a freight terminal in the City of Boston which the Massachusetts legislature ordered discontinued in 1896. To work out a new plan, the New Haven and the lessor of part of its road, the New England Railroad, gave to the Boston & Providence an interest in a new freight terminal, much larger and more expensive. The agreement did not quantitatively·express the extent of this interest; it merely provided that the Boston & Providence should have "the perpetual right to joint use * * * of the freight terminals * * * and of the tracks leading thereto from the tracks of said Boston & Providence * * * so that * * * the facilities for its freight business * * * shall be at least a fair equivalent for * * * those facilities enjoyed by * * * Boston & Providence". At that time the more important of the freight terminals of the New England Railroad, in which the Boston & Providence was thus given an interest, were subject to two mortgages, executed in 1889 and 1895 respectively. No measure was made of the "fair equivalent" of the earlier "facilities" of the Boston & Providence at that time; but on February 7, 1938, the district court passed an order (No. 221) that the rights so created should be "without obligation to contribute to the cost of said freight terminal and tracks, or to the payment of taxes thereon, but subject to a liability for its equitable share of the expenses of maintenance and operation"; also that neither the New England Railroad Company nor the New Haven were under "any obligation * * * to relieve said right of Boston & Providence Railroad Co. from the burden of the mortgages" of 1889 and 1895. The quantum·of the Boston & Providence's interest was left still undetermined, but for the purposes of this proceeding it may now be taken as fixed at 4.04 per cent of the value of the whole new terminals.

The immediate dispute is whether interest falling due upon the two mortgages, and the taxes upon the terminal during the period of the accounting, should have been ·charged in this proportion against the Old Colony in the account, or should be borne by the New Haven. On January 17, 1936, the district court passed an order, applicable ·to all mortgages upon New Haven property, that no mortgagee need demand, or make application for, the profits of any mortgaged property, but that his rights should be the same as though he had demanded them "at the earliest date or dates when any such trustee" (mortgagee) "would have been entitled to make such demand or applica·tion". We must therefore take it that the two mortgagees of 1889 and 1895 were entitled to all profits upon the terminals from the moment that they were entitled to possession because of any default. Of the two items in question—taxes and interest—the exemption from taxes in Order No. 221 was too absolute to admit of any debate; the Old Colony's share in the deficit cannot be charged with any part of them. More can be said for charging it with interest arising under the mortgages, because of the clause, "nor does there now exist any obligation upon the latter" (the New Haven) "to relieve said right * * * from the burden of ·the mortgages". This language certainly means that if the mortgages were foreclosed, the Old Colony could not look to the New Haven for indemnity. But interest upon the mortgages, even after the mortgagees were in possession—as they are here deemed to have been after default—was not part of "the expenses of maintenance and operation" of the terminal; certainly not, when that phrase is contrasted with "the cost of said freight terminal". It would be an undue strain upon the word, "cost", to say that the principal of mortgage was part of it, but at least the borrowed money was more nearly akin to "cost" than to an expense of maintenance; and the interest on the mortgages was no different from the principal.

Therefore, we hold that neither item was properly chargeable against the Old Colony, and the only remaining question is whether they had not already been both included in the "segregation formula". They were clearly not so treated, because the quantum of the Old Colony's interest was first mooted on October 8th, 1937, at a time when the proceeding for reference to the Commission had already been long under way. Moreover, the question was never referred to the Commission at all. It was independently decided before their report came back, though indeed not finally—that is, the actual percentage—until during the course of this very accounting. In view of this it would falsify the proceedings as a whole to deny the benefit of these items to the Old Colony.

Charges against the Old Colony for Deficits on the Terminal and the New England tracks.

The Boston & Providence, originally hauled its freight directly into Boston over its own tracks, as we have said. After the completion of the new terminal, all freight entered that terminal over nine miles of track east of Readville, which belonged to the New England Railroad. In dividing the joint rate the Commission treated the Old Colony as a terminal carrier, and for this reason charged it for its use of the new terminal and this trackage according to its proportion of the total use. The Old Colony objects to this; it insists that it was a connecting carrier only, not a terminal carrier, and that no use of the terminal and tracks should be charged against it. However, those considerations were appropriate to the segregation of the joint rates, and the Commission necessarily passed upon them. Even though the Old Colony did not, strictly speaking, rely upon new evidence, offered for the first time in the district court, it failed to raise the point before the Commission, which, as we have said, alone could consider it initially. It is quite true that the charge was made before the quantum of ownership of the Old Colony had been fixed; but that is different from whether the Old Colony should be charged at all. As between the New Haven and the Old Colony, the Old Colony was indeed entitled to a credit for its interest in the terminal under the agreement of 1904; but that credit disappeared as soon as there was a default upon the New England mortgages. Thereafter, the interest of the mortgagees in possession in the terminal and tracks became paramount, and there was no set-off to the charge. When the credit did cease, and how large it was, we leave for determination by the district court.

Order modified; and cause remanded for further proceedings in accordance with the foregoing.