In re NEW YORK, N. H. & H. R. CO.
No. 16562.

District Court, D. Connecticut.
Nov. 25, 1939.

Hermon J. Wells, of New Haven, Conn., and James Garfield, of Boston, Mass., for trustees of debtor New York, N. H. & H. R. Co.

R. G. Dodge, of Boston, Mass., (Talcott M. Banks, Jr., and R. Ammi Cutter, both of Boston, Mass., of counsel), for claimant Old Colony R. Co.

HINCKS, District Judge.

This matter is now before the court for a determination of the claimant's damages for the loss of future rents resulting from the rejection of its lease by the principal debtor herein. Also involved are other items of claims of lesser dimensions.

The claimant, the Old Colony Railroad Company (hereinafter called O. C.), owns over 500 miles of railroad largely in southeastern Massachusetts. Its lines run from Boston to Plymouth, Fairhaven, Woods Hole and Provincetown, and from

Fitchburg and Lowell to Newport and New Bedford, with various branches. In 1888 O. C. leased, for a term of ninety-nine years, the lines of the Boston and Providence Railroad Corporation (hereinafter called B. P.), comprising the main line from Boston to Providence, with certain branches, being about sixty-five miles. This lease required O. C., as lessee, to pay all operating expenses, taxes, debenture interest and other expenses of B. P. together with sinking fund payments and an annual rental of $400,000.

In 1893 O. C. leased all of its property, with certain immaterial exceptions, to the New York, New Haven and Hartford Railroad Company (hereinafter called N. H.) for ninety-nine years. By the terms of this lease N. H. was to discharge all of O. C.'s obligations under the lease from B. P., to pay O. C.'s operating expenses, taxes, fixed charges and other expenses, and in addition to pay to O. C. as rental sums equal to dividends at the rate of $7. a share per annum upon O. C.'s capital stock. The lease provided that permanent improvements upon the demised property should be financed by O. C. bonds and stock issued at N. H.'s request, and it further provided that no such bonds and stock could be issued by O. C. except under the directions or with the consent of N. H. Pursuant to this lease N. H. in 1893 entered into possession of the O. C. and B. P. properties and thereafter operated them together with its owned lines as integral parts of the N. H. system.

On October 23, 1935 N. H. filed in this court a petition for reorganization under Section 77 of the Bankruptcy Act then in force, 11 U.S.C.A. § 205, and the petition was approved the same day and shortly thereafter trustees were appointed for its estate. On November 30, 1935, an order was entered in the reorganization proceedings providing that if any leases should be subsequently disaffirmed by the debtor all payments made under such leases, and the operation of the leased properties, should be deemed to have been for the account of the respective lessors from October 23, 1935 to the date when such disaffirmance should take place.

On June 2, 1936 the N. H. trustees disaffirmed the lease of the O. C. properties. The following day O. C. filed its petition for reorganization under Section 77 as a debtor in the N. H. proceedings, on the same day its petition was approved and shortly thereafter trustees were appointed for its estate. As O. C., which then lacked equipment, funds and operating organization, made neither reentry nor demand for reentry upon or repossession of the leased properties, the same have been operated by the N. H. trustees, for the account and risk of O. C., from June 3, 1936 to the present.

The O. C. trustees seasonably filed claims against the N. H. estate for damages suffered by virtue of the rejection of O. C.'s lease, and the largest item of claim, that for the loss of rents, is now before this court for a rehearing upon mandate from the Supreme Court of the United States. Palmer v. Palmer, 305 U.S. 578, 59 S.Ct. 647, 83 L.Ed. 364.

During the years before N. H.'s reorganization, when N. H. was in possession of the O. C. and B. P. properties and operating them as integral parts of the N. H. system, the accounts of these properties were consolidated and no separate records were kept which would show the results of operations of these leased lines individually. Shortly after N. H.'s petition for reorganization was filed studies were commenced by the staff of the N. H. and its trustees to discover what the respective mortgaged and leased units of the N. H. system, including O. C. and B. P., were actually earning, and what was their value to the N. H. system as a whole. These studies were of two types, segregation studies and severance studies; the information developed by these studies constitutes basic data for the reorganization of both N. H. and O. C.

The segregation studies are the actual operating revenues, operating expenses and other income account items of the New Haven system assigned directly or apportioned on appropriate bases to each of the mortgage division or leased lines. The results of the segregation studies reflect the earning power of each unit in the system operated as a part of that system. Each unit is credited with the revenue earned on traffic local to the unit, and its proportionate part of earnings on traffic joint with other parts of the system. On the expense side, each unit is debited with costs strictly local to the unit, and its proportionate part on suitable bases of costs which are joint with other units, and of general administrative expense. In other words, the segregation results of the single unit are those of that unit operated as a part of the system and for the benefit of the system,

rather than for the benefit of the individual unit.

The severance study, as distinguished from the segregation, approaches the task from the viewpoint of what the property would do if it were severed from the New Haven. system ·and operated either independently, of itself, or as a part of a system competitive with the New Haven railroad. That involves the determination of the extent to which traffic now enjoyed by the New- Haven system and originating and terminating on the Old Colony might be diverted to railroads competitive with the New Haven and therefore would be lost to the New Haven.

The method for segregating the earnings and expenses of O. C. and B. P., which was arrived at as a result of the studies made, was referred by this court to the Interstate Commerce Commission for its approval. At a hearing before the Commission this method was vigorously. attacked by representatives of O. C. and other interests, but was approved by the Commission, and subsequently by this court. It has since that time been used as the basis for calculating the operating . deficits with which the N. H. trustees have sought to charge O. C.'s property as a prior lien in accordance with the order of November 30, 1935.

The segregation studies showed that from October 23, 1935 forward, both O. C. and B. P. were being operated at very great losses. Because of this fact the O. C. trustees disaffirmed the B. P. lease on July 19, 1938.

These actual operating losses, calculated from October 23, 1935 to January 1, 1939 and estimated for the calendar year 1939 by the Comptroller of the N. H. trustees, the respondents here, .amount to upwards of $9,000,000 for the O. C. and $8,000,000 for B. P. Since O. C. was, on October ·23, 1935, bound to meet all the obligations of the B. P. lease, from O. C.'s viewpoint as of that date operating losses exceeding $17,000,000 were in immediate prospect, and have since been established and proved to the satisfaction of the respondents.

■ The applicable measure of damages is the. present value as of October 23. 1935, of the rental which N. H. was obliged under O. C.'s lease to pay, less the rental value, as of the same date, of the remainder of the term. Connecticut Ry. & Ltg. Co. v. Palmer, 305 U.S. 493, 59 S.Ct. 316, 83 L. Ed. 309.

■ Here the annual rent can be taken as fixed by the disaffirmance at $1,755,432. Under the lease the. rental payments were to equal dividends at the rate of 7% per annum, upon the outstanding capital stock. On the basis of the stock outstanding on October 23, 1935 this amounted to $1,755,-432. Clearly, the respondents cannot object because a higher figure is not found to represent the rental. Nor is there room for the contention that a lower figure should be taken on the theory that but for the reorganization of the N. H. and the rejection of the. O. C. lease the number of shares of O. C. stock outstanding might ultimately have been reduced. Obviously the minority stockholders would not have assented to a reduction which would directly reduce their dividends. And the N. H., which owned a bare majority of the stock, could not have accomplished a reduction which because of its status as lessee would have inured to its own advantage but to the disadvantage of minority stockholders, without violation of a fiduciary duty to the minority interest. Accordingly, for present purposes the annual rent may be taken as fixed by the disaffirmance of the lease at $1,755,432.

■ I find from the evidence that 4% would constitute a proper rate of discount. The evidence shows that interest rates in the United States have been generally declining for as long a period as accurate records are available. The yield of highest grade bonds over a period of time in my judgment is the best available measure of future discount rates. On this basis a rate of 4% is indicated. The conclusion is supported by expert testimony which inspires confidence. Claimants do not ask for a rate lower than 4%, and they seem not to dispute that the discount should be compounded quarterly, the lease having provided for quarterly payments of rent. There was no substantial testimony in support of a higher rate of discount. And so, on the basis of a 4% rate, compounded quarterly, I find that the present value, as of October 23, 1935, of the stipulated rental for the balance of the term, is $39,339,161.

I turn now ·to the other factor in the measure of damages, viz., rental value. The rental value of the remaining term of the O. C. lease, from October 23, 1935 to March 1, 1992, in the last analysis depends principally upon the volume of traffic which the territory served will develop and the capacity of the O. C., in competition with

all the other agencies and instrumentalities of transportation, profitably to sell its services for the carriage of that traffic. These are factors which look to the future; for their existence and their dimensions we must look to all the corresponding and relevant trends of the past.

A wealth of relevant evidence has been presented, much of it obtained from the numerous studies of the O. C. and N. H. properties and territory made by the staff of the N. H. trustees and various independent agencies in connection with N. H.'s reorganization. Because of the availability of these studies, and the intense scrutiny to which O. C. in particular has been subjected during the reorganization proceedings, wherein the economic justification for its continued existence has been brought into question by the large losses it has sustained, it has been possible to present a record of fact of truly extraordinary breadth and detail.

For about twenty years the territory which Old Colony serves has been declining, not only in comparison with the United States as a whole but in comparison, also, with contiguous territory. This fact clearly appears from the testimony and exhibits of Professor Snider, a qualified expert on these subjects, who has made a study of the economic history and present situation of this part of Massachusetts and Rhode Island. From this study it appears that the territory in which both O. C. and B. P. are located is predominantly industrial. It contains no agricultural crop of comparative significance. The principal manufacturing industries are shoes, cotton textiles, wool textiles, clothing, bakery products, confectionery and jewelry, with some others of lesser importance. The territory has suffered greatly from the migration of the cotton textile industry from New England and to some extent from industrial migration in other industries. A study of the indices of manufacturing activity, in particular the value of the product and the number of wage earners, shows that from 1919 to 1933 the trend here was steadily downward, with hardly any interruption, even in the years 1923–1929, which were notably prosperous elsewhere. Since 1933, the recovery of the O. C.-B. P. territory has been at a lesser rate than that of Massachusetts as a whole, and Massachusetts has lagged far behind the United States. In 1933 the index of value of product was below its 1914 level for the O. C.-B. P. territory, although

for the United States that index was relatively 12 points higher; and in number of wage earners, when the United States in 1937 stood 20 points higher than 1914, the territory served by these railroads was 22 points below the 1914 level.

The municipalities local to the O. C. alone, as distinguished from those served by B. P., make an even more unfavorable comparison with Massachusetts and with the country. In 1919 the products of the O. C.-B. P. territory represented 3½% of the total value of products of the United States, but that ratio has steadily dropped until in 1937, the last year for which figures are available, it stood at 2.09%,—the lowest point shown by available records. For the territory of O. C. alone, the percentage drop in the same period was from 1.66% to .78%; in that time the relative importance of the towns and cities local to O. C. had, in terms of that significant index, been more than halved.

A large number of studies of individual towns and cities along the lines of O. C. and B. P., which Professor Snider introduced in evidence, show conclusively that the decline of the territory is not because of the drop in a few key cities, but is general. There are occasional exceptions which confirm the objectivity of the research but have no great influence on the result. Further studies of leading industries in the individual towns reinforce the conclusion that the declining tendency is pervasive throughout the territory. The two most important industries in the territory, leather goods (including boots and shoes) and cotton goods, show the sharpest declines. Studies of the trends of these industries in the state of Massachusetts, as contrasted with the United States, demonstrate the same clear tendency. To be sure, some industries of lesser importance to O. C. and B. P., particularly woolen goods, jewelry, clothing and foundry and machine shop products, seem to have held up relatively well in the territory and in Massachusetts; but in the main a general and widespread decline is clearly apparent.

Professor Snider testified that he could see no reason to expect a reversal of this unfortunate trend, and that he anticipated its continuance, although possibly at a somewhat lesser rate. For the decline has already been of long duration, the migration of industry from the territory still continues, although now at a slower pace, and

the growth of population is slowing down as contrasted with territory which adjoins and with the entire country. The territory is mature, has long been highly developed industrially and is without unexploited natural resources; in these respects it is less favorable for growth than other sections which are not so old and so fully developed and populated. Recent federal legislation tending to equalize wages and working conditions may be expected to work to the advantage of this section, but its effect is still conjectural. The United States as a whole exhibits clear evidence of a declining rate of growth, both in population and in production of manufactures. Professor Snider's conclusion that the future of the territory served by O. C. and B. P., industrially and economically, contains no promise of marked revival, appears fully justified.

These economic trends of the O. C.–B. P. territory are directly reflected in the traffic on these roads. Freight revenues in particular will follow the course of industrial activity. Compared to B. P. territory, the index of revenue tons originated or terminated for O. C. cities and towns (excluding Boston) lags behind steadily from 1923 on, until in 1938 it is less than two-thirds that of the adjoining section. The evidence shows that recently some new industries of sizable dimensions have sprung up in the territory, but figures are lacking to indicate that the broad trends noted above are appreciably affected thereby. To be sure, the presence in the territory of vacant plants and unemployed skilled workers, may eventually prove attractive to new industries, but it is impossible to say with assurance that such factors will succeed in reversing a trend which they were powerless to prevent.

The situation of O. C.'s passenger traffic is admittedly desperate. All of this traffic on O. C. is local, short-distance travel, which moves at unremunerative commutation rates, almost all of it into and out of Boston. Further, it is peak-load traffic. Tests have shown that 66% of the passengers arriving at Boston during the day arrive in the 90-minute period between 7:30 A. M. and 9 A. M., while a slightly larger percentage of the outgoing traffic leaves Boston between 4:10 P. M. and 6:30 P. M. The average revenue per passenger on the O. C., B. P. and New England lines is only 24 cts., as contrasted with 96 cts. for the balance of the N. H., and there is a simi-lar, if somewhat smaller, discrepancy in the average revenue per train mile. The B. P. local passenger traffic, which represents 52% of its total, is little if any better. The conclusion stated by Mr. Wall, the N. H.'s vice president in charge of the Traffic Department, that he could not see "any hope" that the O. C. and B. P. local passenger traffic would become profitable or even self-sustaining, is abundantly supported by the evidence.

Competition by trucks and motor vehicles, private and commercial, is the major contributing factor to the decline of railroad business in O. C. and B. P. The O. C., whose rails are parallelled with hard-surfaced highways, is particularly vulnerable to this competition. I am told that the O. C. is the only railroad in the country which can service its roadbed from work trucks on a nearby highway more economically than from a work train. Distances in the territory are relatively short and there are a large number of cities and towns scattered throughout. The development of Massachusetts' highway system, which involved the complete rebuilding and widening of the major highways in the territory, and the creation of a system of super-highways for high speed traffic, has covered the O. C. and B. P. section with a network of broad state roads reaching practically into every town.

The results of this development are seen in maps of traffic flow made during various years. When, in 1909 and even in 1915, the number of vehicles passing daily during August on the main routes was hardly appreciable, counted at the most in the low hundreds in 1915, by 1924 a considerable proportion of the highways in eastern Massachusetts were used by a thousand or more cars on comparable days, while by 1933 there were few main highways in that part of the state that were not used by five or ten thousand vehicles on an average day at that time of year, and counts of fifteen thousand on Sundays were not uncommon. A comparison of railroad passenger traffic and motor vehicle passenger traffic, made in the O. C.–B. P. territory in 1936 and 1937 shows the railroad passengers outnumbered at least three to one even in the area near Boston where the rails are most heavily patronized, while from thirty miles outside Boston to the extremes of the territory railroad passenger traffic, except on the B. P. main line, is hardly appreciable, while the roads are used by thousands every day.

Another measure of this shift from rails to highways is the number of passenger car registrations, which, in Massachusetts, has averaged over 700,000 in the last ten years. The total direct costs of operating automobiles have fallen more than fifty per cent since 1925, and it is a matter of common knowledge that constantly better and more powerful cars at cheaper prices have become available during this time. It was estimated by Mr. Wall that there is an average of one car to every family in southeastern Massachusetts, where O.C. and B.P. are located.

Statistics on truck competition are also revealing. A comparison between truck traffic, both light and heavy, and railroad freight in the O.C.-B.P. section is very unfavorable to the rails which, except on the main B. P. line, carry only a very small fraction of the total tonnage. The most important manufactured products of the territory, shoes, cotton textiles and woolen goods, are especially suited to truck transportation. The registration of trucks in Massachusetts has grown steadily from 1,000 in 1909 to over 100,000 in 1938. Professor Breed testified that the Massachusetts registration fee for the heaviest trucks allowed on the highways is only "something like $60.", and that in the three southern New England States "65 cts. on the dollar cost of highways is paid from general taxation and 35 cts. only is the payment by the user of the highway." (Witness speaking from memory without aid from memorandum). There may be grounds for hoping that some of this traffic may be recovered by the railroads in the future, as trucks become subject to more regulation and are obliged to bear a greater proportion of the cost of building and maintaining highways, but these developments are likely to be slow. One would expect the federal Motor Carrier Act to have little effect on local traffic. The N. H. system has reduced its rates, and several years ago instituted a costly pick-up and delivery system, in an attempt to meet truck competition, but none the less the record fails to show any real change of trend. In any event, trucks and private automobiles can be considered as permanent factors of first importance in the future of O. C. and B. P., and since they have become established in this position, during the last three decades, the outlook for these railroads is definitely less promising than theretofore. Even if the constant increase in the effect of their competition is ultimately arrested and a balance struck, there is no evidence to indicate that the balance will result in any substantial recovery of traffic by the O. C.

Another form of competition in the O.C.-B.P. territory is water-borne traffic. This has been considerably aided by the Cape Cod canal, which shortens the coast-wise voyage from Boston south by about 78 miles, and is being operated as a toll-free waterway by the United States Government at an expense of about $400,000. annually. Since Providence, Newport, Fall River, New Bedford and Boston all have excellent facilities for this traffic the territory as a whole is particularly open to competition of this character. Coal and petroleum, which would otherwise be substantial producers of rail revenue, are the principal items of this tidewater traffic. There is a possibility, also, of construction of a pipeline to carry petroleum and its products inland from Fall River which, if it materializes, would be in direct competition with O. C.

The competition of airplane traffic between New York and Boston, which affects the B. P. main line traffic, although not yet a factor of importance is increasing steadily. Last year about 81,000 passengers were carried between those two cities by air. Steamship passenger competition between Boston and New York has somewhat decreased, due doubtless in part to the discontinuance of the Fall River Line, but the competition of the highway bus lines, which heavily undercut the railroad in rates, remains quite severe. The most serious passenger traffic competition, however, apart from the private automobile, is in the suburban area surrounding Boston, where the Boston Elevated Railway's rapid transit underground, high speed trolleys and street railways connect with the street car and motor coach lines of the Eastern Massachusetts Street Railway Company to form a complete transportation network. The effect of this competition is reflected in the fact that although the population of the suburban area served by O. C. has increased substantially since 1920, the number of passengers carried in and out of Boston by O. C.'s Atlantic gateway has been more than cut in two in the same period.

The competitive situation may thus be summarized. The public highway, the canal, and the airport are heavily subsidized by one facet or another of the Government.

There is no evidence that the competition of the railroad · with these subsidized agencies will diminish; there is at most a tenuous indication that it will not continue to increase; and the view that it will be substantially diminished rests only upon a hope in the breasts of those interested in the welfare of railroads (a class, presumably, less numerous than those using the free highways) and upon the belief of students of transportation and of government that a sound national economy will require the coördination of all the principal agencies of transportation in a system under which an absence of public subsidy would leave each to perform the function for which it was best adapted. Thus we have a conflict between fact and faith. But even if in the course of time faith and hope shall prevail, in the light of past experience I can foresee no change in the competitive system sufficiently substantial and seasonable to give value to an unexpired term which in its first four years has sustained such devastating losses.

We have come, then, thus far. In October, 1935, the leased property was faced with the immediate prospect of staggering losses as the experience of the ensuing four years has actually demonstrated. Nothing in the background of local economic trends or in the competitive situation then existed or has since occurred to justify the expectation that initial losses of such dimensions would be offset by corresponding gains within the period of the unexpired term. Indeed, counsel for the claimant has pointed out that the bare operating losses for the O. C. system of $17,-000,000 mentioned above as accruing up to December 31, 1939, if augmented by bond and bank interest accrued and unpaid and by other recurrent obligations for which the N. H. was liable under the lease, would increase the aggregate loss to some $23,-000,000; that it would require earnings of $4.70 per share ($1,178,647 per annum above fixed charges and expenses) on O. C. stock, beginning January 1, 1940 and continuing for the entire remaining fifty-two years of the term, before the discounted value of these deficits accumulated up to December 31, 1939 would be offset; and that without a reasonable certainty of such earnings, the unexpired term as of October, 1935 was wholly without any positive rental value. The basis for these figures, in so far as they deal with the accrued deficit,

has been finally adjudicated. Palmer v. Palmer, 2 Cir., 104 F.2d 161, certiorari denied, 60 S.Ct. 120, 84 L.Ed. ——.

Nor is there room for the contention that some modification or abandonment of operations, lying within the range of any reasonable possibility, might give positive value to the remainder of the term. This possibility was thoroughly explored through the studies of the property made by the Committee of Experts established by Order 303 in these proceedings and by the further researches of this Committee pursuant to Orders 320 and 348.

One of the primary purposes of the studies was to determine whether these railroads, and O. C. in particular, could be operated profitably if various economies could be instituted, service discontinued or limited, or certain sections wholly abandoned. To facilitate consideration of this problem the studies divide the O. C. into seventeen segments and the B. P. into three segments, each of which receives separate analysis. The O. C. segments are also placed in three groups; the Boston group, where the loss was discovered to be heaviest, comprising the lines from Boston to Plymouth and Middleboro, with branches; the Cape group, comprising the lines from Middleboro south and east to Fairhaven, Woods Hole and Cape Cod; and the Western Group, being the lines and branches running from Fitchburg and Lowell to Adamsdale Junction, Newport and New Bedford. A severance study was first made of the O. C. as a whole. Detailed severance studies were then made for the Cape and Western Groups, and the Boston Group as well. The effects of the total abandonment of the Boston group were also the subject of a study, the effects upon both O. C. and the rest of N. H. Another study was concerned with the results of abandoning passenger service on all the O. C. lines and their operation for freight traffic only; and, finally, there was an individual study made of what the results would be if O. C. were cut down to only the Cape and Western Groups, and those operated without any passenger service. The textual treatment of all these subjects is amply supported with density charts, figures on operating revenues and expenses, and much other data from the records of O. C., B. P. and N. H.

Specific economies of other sorts were also considered, this part of the studies car-

548

rying forward intensive work begun by the N. H. trustees shortly after N. H.'s reorganization commenced. In this connection special studies were made as to physical facilities not needed, as to materials and supplies, and as to the method of handling less than carload traffic, as well as a study of the equipment now in use—that is, the locomotive, passenger cars and freight cars, —its suitability, adequacy and the possibilities of substitution of more modern types. Consideration was also given to possible reduction of O. C.'s fixed charges, and it appears that no reduction can reasonably be expected since O. C.'s capital expenditures will probably average $150,000—$200,000 per year in the future, and B. P.'s —which O. C. must bear under the B. P. lease—another $50,000—$100,000 annually. It is, of course, hardly reasonable to expect that O. C. could succeed in refunding its outstanding bonds at a lower rate, in view of the loss of its lease and the reorganization of N. H., its most probable lessee.

All of these studies were carried through with reference to the results of two separate years, the year ending August 31, 1938, which was a period of very poor traffic, and the prior year ending May 31, 1937, when traffic was considerably improved. Without going into the detail of these studies, I will merely state that coupled with the other relevant factors discussed above they afford full support for the conclusion that the unexpired term is without any rental value.

The conclusion is further supported by convincing opinion testimony by a highly competent expert. Professor Cunningham, who was designated by the Savings Bank Committee as a member of the Committee of Experts referred to above and, having been designated by the court as chairman, collaborated with Mr. Kennedy, a member designated by the Insurance Companies Group, has been Professor of Transportation at the Harvard Business School for more than twenty years. He has had wide practical experience as well as theoretical training in railroad affairs. His judgment is entitled to respect and inspires confidence not only amongst those who have been associated with him in these proceedings but also in the national field of railroad operation and economics. As a co-author of the reports on the studies referred to and as the author of the Summary thereon, he is peculiarly qualified to apply the mass of informative material which they contain.

Professor Cunningham testified that on the basis of all this information it was his considered opinion that even with the total abandonment of passenger service, which would be the most profitable arrangement possible, O. C. could only be expected (on the volume of traffic of the year ended May 31, 1937) to cover its operating expenses and about one-half of its fixed charges. The difficulties in the way of obtaining such abandonment of passenger service are, as he testified, very great, but even if they were overcome O. C. would still be operated at a net loss. The savings from eliminating that service, including the heavy Boston Terminal charges, would not be enough to make the railroad show a profit.

Professor Cunningham further testified that the most valuable use to which O. C. could be put would be as a part of the N. H. system. The O. C. would not be worth as much to any other possible lessee as it would be to the N. H., of which it has been a part for nearly half a century, and which it tends to complement particularly when B. P. is included. Nevertheless the B. P. lease is a drag on O. C., and is not worth its present rental to O. C., taking everything into account. Independent operation of O. C. would show even more unfavorable results.

On the basis of his knowledge of the situation, Professor Cunningham stated his considered judgment upon the present rental value of the balance of the O. C. lease on October 23, 1935. In arriving at this judgment he took into consideration the economic trends and traffic potentialities of the territory as he knew them, his opinion here being based upon his own knowledge and not upon Professor Snider's charts, although the charts were consistent with what he himself knew. He considered the effects of motor truck and motor-car competition, with which he was fully familiar, having made a special study of the latter. He took into account the operating losses which have been disclosed since October 23, 1935, and gave weight to the fact that a prospective lessee at that time would have faced the practical certainty of heavy losses during the first years of the lease. He had in mind all the various economies investigated and recommended in the Committee's studies. He also considered the amount of traffic which O. C.-B. P. would contribute to N. H. or any other lessee,—a factor which would increase the rental value of a railroad above its prospective direct earn-

ings,—as well as specially valuable properties owned by O. C. and B. P. and the strategic value which that ownership or other factors contribute to these railroads. In short, he took into account the specific considerations and facts which a hardheaded prospective lessee would naturally have inquired into and had in mind in considering a long-term lease. His definite opinion, stated without qualification, was that with or without the B. P. lease the property of O. C. on October 23, 1935, had no rental value (above fixed charges and expenses) to any lessee for a term equal to the balance of the original O. C. term.

The conclusion I deem sufficiently supported by the incomplete summary of the record stated above. But I predicate my decision upon the entire record, which I have attempted to weigh even though space precludes its extended recital. I find, therefore, that on October 23, 1935 the property which was the subject-matter of the lease was wholly without present rental value for the unexpired term and allow this item of claim in the amount of $39,-339,161, that being the present value as of October 23, 1935 of the stipulated rental for the remainder of the term computed as above indicated.

There are also now before the court items of claim involving alleged breaches of covenants in the lease to pay taxes, to pay bond interest and interest on bank loans and to pay operating expenses. The claimants, however, apparently concede on brief that these items of alleged damage are sufficiently "taken into account as part of the main question of rent less rental value, since the factor rent is measured, in accordance with the terms of the lease itself, by amounts earned towards dividends on the stock after the payment of operating expenses, taxes and fixed charges." With this analysis I agree.

There remains only the claim of damage with respect to the contingent liability for back income taxes. Four years have now elapsed since these proceedings were initiated. If the item is one not susceptible of proof within this period, it is not allowable under the rule of Pennsylvania Steel Co. v. New York City R. Co., 2 Cir., 198 F. 721. If susceptible of proof, it must be disallowed for lack of proof.

An order in accordance with the foregoing may be submitted on notice.