## COMMISSION OF DEPARTMENT OF PUBLIC UTILITIES OF COMMONWEALTH OF MASSACHUSETTS v. NEW YORK, N. H. & H. R. CO.

### No. 40, Docket 21392.

United States Court of Appeals Second Circuit.

Argued Nov. 10, 1949.

Decided Dec. 13, 1949.

Francis E. Kelly, Attorney General, by Francis J. Roche and David H. Stuart, Assistant Attorneys General, for appellant.

H. J. Wells, New Haven, Conn., counsel for the New York, New Haven and Hartford Railroad Co., appellee. J. H. Gardner, Jr., New Haven, Conn., of counsel.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

This appeal is another phase of the reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, of the New York, New Haven and Hartford Railroad Company. The Commission of the Department of Public Utilities of the Commonwealth of Massachusetts has appealed from an order of the reorganization court restraining it from interfering with the reorganized New Haven's curtailing passenger service, as of March 1, 1949, on what used to be the lines of the Old Colony Railroad Company but what now, as a result of the reorganization, are the lines of the Old Colony division of the reorganized New Haven, appellee herein. As the principal question is one of construction of the provisions of the plan of reorganization relating to passenger service on the Old Colony lines, a review of the manner in which those provisions were arrived at is necessary.

On October 23, 1935, the New Haven, which was operating the Old Colony lines under a 99 year lease, filed its petition for reorganization. In June, 1936, when the New Haven trustees rejected the Old Colony lease, the Old Colony Railroad Company filed a petition for reorganization in the New Haven proceedings, and subsequently the New Haven trustees, who were appointed as trustees for the Old Colony, continued to operate the latter's lines on its account.

On June 20, 1938, some of the New Haven's creditors petitioned the district court to direct the trustees to discontinue stops of passenger trains at numerous stations in Massachusetts, most of which were on the Old Colony line. The district court

561

granted the petition and so ordered the trustees, but we reversed, Converse v. Commonwealth of Massachusetts, 2 Cir., 101 F.2d 48, and the Supreme Court affirmed on the ground that " * * * it would violate the traditional respect of Congress for local interests and for the administrative process to imply power in a single judge to disregard state law over local activities of a carrier the governance of which Congress has withheld even from the Interstate Commerce Commission, except as part of a complete plan of reorganization for an insolvent road.[15]" Palmer v. Massachusetts, 308 U.S. 79, 88, 60 S.Ct. 38, 84 L.Ed. 93. Footnote fifteen in the opinion quoted in pertinent part subdivision f of Section 77.[1] The Court then went on to say that: "Perhaps it is no less true that amenability to state laws will serve as an incentive to the formulation of reorganization plans which, on approval by the Commission, do supplant state authority." 308 U.S. at page 89, 60 S.Ct. at page 39, 84 L.Ed. 93.

In attempting to formulate a plan of reorganization for the New Haven, Division 4 of the Interstate Commerce Commission originally determined that the reorganized New Haven "would not be financially justified in acquiring the properties of the Old Colony and assuming the burden of their operation as presently conducted, nor could the Old Colony successfully operate as an independent carrier." 239 I.C.C. 337, 380-82. It also rejected the proposal of the Old Colony that the reorganized New Haven acquire all of the Old Colony lines except the so-called "Boston group," a portion of the lines including those between Boston and Middleboro and Plymouth, the deficits in operating which had been considerably larger than those incurred with respect to the so-called "Western" and "Cape" groups. Ibid. Accordingly, the Commission omitted from the plan of reorganization for the New Haven any provision with respect to acquisition of the Old

Colony lines, and operation of them continued by the trustees, as before.

Subsequently, however, the Commission reopened the proceedings, and, in its first supplemental report and order, dated February 18, 1941, in response to the petition of the Commonwealth of Massachusetts and various other interests, and over the New Haven's objection, modified the plan so as to make it provide for acquisition by the reorganized New Haven of the Old Colony properties, and, in partial payment therefor, issuance by the reorganized company of certain of its first and refunding bonds, income bonds and preferred and common stock to the Old Colony trustees. 244 I.C.C. 239. Contending that it had the power, under subdivision f of Section 77 and Palmer v. Massachusetts, supra, to authorize, as part of a complete plan of reorganization for an insolvent road, "a matter * * * such as the complete or partial discontinuance of passenger service," in addition to abandonment by the railroad of all its property, the Commission determined that, while the record did not justify it in making it an immediate condition of the acquisition of the Old Colony properties "that passenger service on the Old Colony as a whole or in the Boston group be discontinued," nevertheless it should be a condition of the plan that, upon request by the New Haven or its successor, the Commission should estimate the average yearly loss and yearly savings for the years 1941 and 1942, or 1941 to 1945, if the Old Colony properties had not been operated as a part of the New Haven system, and that if the estimate as to the average yearly savings did not exceed the average yearly loss by an amount equal to the annual contingent interest charges on the income bonds issued in acquisition of the Old Colony properties, then "the principal debtor or its successor shall thereafter be under no obligation to continue passenger service on the Boston group of the Old Colony * * *." 241 I.C.C. 239, 263-65.

---

1. "Upon confirmation of the plan, the debtor and any other corporation or corporations organized or to be organized for the purpose of carrying out the plan, shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto * * * the laws of any State or the decision or order of any State authority to the contrary notwithstanding."

In this connection, significantly, the Commission noted "that the public authorities and the communities concerned are now keenly alive to the danger that service may be discontinued, in whole or in part * * *." Id. at 264.

When this part of the plan was rejected by the district court as of doubtful validity and effectiveness in protecting the reorganized New Haven against unreasonable losses resulting from Old Colony passenger operations, the Commission again considered the problem, but in the light of a joint report agreed upon by various of the parties in interest. In its third supplemental report and order, dated October 6, 1942, 254 I.C.C. 63, the Commission determined that the reorganized New Haven, as well as the Old Colony, should be relieved of any statutory or franchise obligations "to operate passenger service on Old Colony lines," but that the reorganized company should "undertake a contractual obligation to operate for its own account passenger service on Old Colony lines if and so long as the losses therefrom do not exceed the critical figures provided below." Section N(2) (a) of the Plan of Reorganization. The Commission then went on to provide, in subsection (3) (a) of that Section that: "Passenger service on Old Colony's lines may be discontinued if during any of the periods described below passenger losses on Old Colony's lines shall exceed the critical figure at the time in effect. The critical figure for any 12 consecutive calendar months, all of which are within the period of 2 years following the consummation of the plan, shall be $850,000. The critical figure for any 24 consecutive calendar months, all of which shall be after the end of the 2 year period, shall be $500,-000." And, after referring to a segregation formula under which the amount of passenger loss on Old Colony lines should be computed for purposes of determining whether the critical figures had been reached, it was provided in subdivision (b) of subsection (3) that: "The result of such computation shall determine whether or not the critical figure has been met, unless the Department of Public Utilities of Massachusetts (or its successor) be aggrieved by a proposed discontinuance of passenger service on Old Colony lines pursuant to the authority contained in the plan and claim that the computations of the reorganized company are inaccurate; in which case it may apply to the District Court for the District of Connecticut for the appointment of a master to audit such computations."

The Attorney General and the Special Railroad Commission of Massachusetts then filed petitions for modification of the plan so as, among other things, to permit the Commonwealth to have the option of purchasing the portion of the Old Colony Boston group lines extending from Boston to Braintree at the salvage value thereof less the depreciated amount of subsequent capital improvements agreed to by the Commonwealth; to provide that there should be no discontinuance of service so long as the Old Colony properties' earnings were sufficient to pay the interest on the fixed-interest bonds to be issued in acquisition of those properties; and to "Permit no more discontinuance of passenger traffic on the Old Colony properties than is needed to reach the critical figures." 254 I.C.C. 405, 421-23. In its fourth supplemental report and order, dated July 13, 1943, the Commission refused the Commonwealth's latter two requests but accepted, and incorporated into Section N(3) (a) of the plan, a provision giving the Commonwealth the option sought for, on the ground that in the event of discontinuance of Old Colony passenger service upon the critical figures' being reached, the Commonwealth might be obliged to furnish transportation to the patrons accustomed to using the Boston group lines and consequently should not be in a disadvantageous bargaining position with respect to the acquisition of them. While the Commission did not say whether the option was to be exercisable upon election by the New Haven partially to discontinue service, or only upon an election to discontinue service altogether, it did, not insignificantly, note that in this connection, "The Commonwealth also points out that the plan approved by our third supplemental report does not confine relief from passenger operations to the

Boston group, as did the plan approved by our report of February 18, 1941, but under it, apparently curtailments could be made on all the Old Colony lines." Id. at 421-22. That is to say, the Commonwealth of Massachusetts then recognized that curtailment, or partial discontinuance, as well as total discontinuance, of passenger service was permissible under the plan.

The District Court on December 21, 1943 approved that part of the plan relating to Old Colony passenger service, with presently unimportant modifications, but construed the option provision to apply only to such of the facilities in the Boston to Braintree lines as might reasonably be required by the Commonwealth for its passenger operations, subject to a right of joint use in the New Haven, and reserved jurisdiction to determine what facilities would reasonably be required. In re New York, N. H. & H. R. Co., D. C., D. Conn., 54 F.Supp. 595, 614-617. The Commission, in its fifth supplemental report and order, dated February 8, 1944, agreed to the court's modifications and construction of the option provision and accordingly modified the plan. 257 I.C.C. 9. The plan was then approved in its entirety by the district court. In re New York, N. H. & H. R. Co., D. C., D. Conn., 54 F.Supp. 631.

On appeal we approved that part of the plan which related to Old Colony passenger service, and, citing subdivision f of Section 77 and Palmer v. Massachusetts, supra, said that: "Whether the curtailment of service is required in the public interest was a matter for the Commission to decide. The general public interest of keeping an interstate railroad running must override the local public interest of Massachusetts if the Commission thinks the two incompatible. The contention is not persuasive that the Commission lacks the power by means of a plan of reorganization to amend the charters of New Haven and Old Colony or to relieve them of performing passenger service unless the state authorities give consent." In re New York, New Haven & Hartford R. Co., 2 Cir., 147 F.2d 40, 51, certiorari denied 325 U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999, rehearing denied 326 U.S. 805, 66 S.Ct. 16, 90 L.Ed. 490.

Finally, in its sixth supplemental report and order of May 14, 1925, 261 I.C.C. 195, 202-04, the Commission adhered to that part of the plan relating to Old Colony passenger service as modified in its fifth supplemental report and order. The district court approved, and we affirmed. Old Colony Bondholders v. New York, N. H. & H. R. Co., 2 Cir., 161 F.2d 413. On September 11, 1947, the Consummation Order and Final Decree was entered by the district court and on its effective date, one week later, the Old Colony property was acquired and paid for by the New Haven under the plan of reorganization.

Operation by the New Haven of the Old Colony passenger service was undertaken as provided in the plan, but it became clear that the critical figure of $850,000 for any 12 consecutive calendar months within the first two years after the consummation of the plan would be reached by October 1, 1948. Pursuant to the request of the Governor of the Commonwealth of Massachusetts, however, the reorganized New Haven determined not to exercise its election to discontinue the service at least until March 1, 1949, on the understanding that the company's rights under the plan would remain unimpaired. On February 8, 1949, however, it issued a public statement that commencing on March 1, it would discontinue operation of 45 Monday to Friday, 41 Saturday only, and 28 Sunday only, trains then operating on the Old Colony division, leaving in operation trains handling over 80% of the train-travelling public in the Old Colony area. On the last day in February, appellant issued a stop order, requiring the New Haven to continue the service then being furnished on the Old Colony division, pending investigation by it and a public hearing. That same day the New Haven obtained a temporary restraining order against appellant and the following day, March 1, 1949, petitioned for construction of the plan and for a permanent injunction. The district court construed the plan so as to permit the curtailment of service and granted the injunction.

██ Any construction of a plan of reorganization by the district judge who is familiar with every phase of it is necessar-

ily entitled to great weight. This is particularly true where, as here, that judge has previously dealt with, in some detail, the very provisions in question. But we need not rest decision on the ground that matters of construction fall within the scope of district court discretion, no abuse of which has here been shown. A majority of the court considers the construction put upon the plan by the court below plainly correct.

■ The pertinent parts of Section N(2) (a) and (3) (a) of the plan in its final form respectively provide—as they did as a result of the Commission's third supplemental report and order—that the reorganized New Haven shall "undertake a contractual obligation to operate for its own account passenger service on Old Colony lines if and so long as the losses therefrom do not exceed the critical figures provided below," and that "Passenger service on Old Colony's lines may be discontinued if during any of the periods described below passenger losses on Old Colony's lines shall exceed the critical figure at the time in effect." The Commonwealth of Massachusetts now makes the rather startling contention that these provisions mean that the New Haven must either discontinue all of the Old Colony passenger service or not discontinue any of it, that is, that the words "may be discontinued" do not mean "may be curtailed." To give such a meaning to them, however, would be unreasonable. Either the reorganized company would have to operate the lines at a loss greater than necessary or the train-travelling public in the area served by them would be without any service whatsoever except as the Commonwealth of Massachusetts exercised its option to purchase, an option which covers not all those lines, but only that portion of the Boston group lines extending from Boston to Braintree. Such a manifestly unreasonable construction should be avoided if possible. Here, moreover, ample considerations weigh against it.

If we refer to the actual words themselves, "may be discontinued," and give them their ordinary meaning, it would seem plain that they should be held to mean "may be discontinued in part" as well as "may be

discontinued in its entirety": the greater includes the lesser, unless something to the contrary appears. But nothing does appear. Indeed, the above recital of the background of this case shows that, when the Commission first made acquisition of the Old Colony properties a part of the plan, and first provided that the reorganized company should be under no obligation to continue passenger service on Old Colony lines, it noted that the public was "alive to the danger that service may be discontinued, in whole or in part * * *." 244 I.C.C. 239, 264. It further stated that it had the power to authorize as part of a complete plan of reorganization for an insolvent road "a matter * * * such as the complete or partial discontinuance of passenger service," as well as power, under Section 1(18) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), to authorize abandonment of all of a given line. Ibid. Indeed, the Commission subsequently noted that the Commonwealth of Massachusetts itself considered that under the plan "apparently curtailments could be made on all the Old Colony lines." 254 I.C.C. 405, 421. Thus, the word "discontinued" was thought from the beginning by all concerned to mean "discontinued in part" or "curtailed" as well as "discontinued in its entirety." While it is, perhaps, not of great significance, we thought similarly, for in Re New York, New Haven & Hartford R. Co., supra, we referred to "the curtailment of service" allowed by the plan.

Appellant argues that the Commission expressly rejected the idea of a partial discontinuance of service, but apparently the only basis for this argument lies in its rejection of the Massachusetts' proposal to "permit no more discontinuance of passenger traffic on the Old Colony properties than is needed to reach the critical figures." But we do not perceive how the Commission's refusal to impose such a qualification upon the right to discontinue lends support for a construction of the plan that would make the right to discontinue subject to the qualification that the service must be discontinued in its entirety.

■ Nor does the fact that the Commonwealth was given an option to purchase

a portion of the Boston group lines in the event that the reorganized company "shall elect to discontinue passenger service on Old Colony's lines * * *" have any bearing. For this option was, as appellee has suggested, an afterthought of the Commission. That is to say, the option provision was inserted in the plan after the New Haven's right to discontinue service had been fully crystallized. Moreover, the fact that the Commonwealth sought, and the Commission granted, an option relating only to the Boston group lines would seem to indicate, not that they were not interested in the public using the "Western" and "Cape" group lines, but, if anything, that they thought it likely that any discontinuance of service would take place, if at all, with respect to the segment of the lines which had in the past shown the largest operating deficits, and thus recognized that discontinuance could, and probably would, be a partial affair.

Finally, the fact that under this construction of the plan, there may be partial discontinuance of service without first obtaining approval of any regulatory body is, of course, irrelevant. For, whichever way the plan is construed, there may be discontinuance of passenger service without such approval and in neither event is such discontinuance made as a result of the Commission's power over abandonments.

Thus, all things considered, it seems plain that the plan was properly construed to mean that, the critical figures having been reached, appellee could discontinue passenger service on the Old Colony division in whole or in part. And, this being true, the rest of appellant's arguments collapse.

█ The first of these is that a district court in a reorganization proceeding may not enlarge the powers reserved by it under a reservation of jurisdiction. This is, of course, sound law, but wholly inapplicable, for here the court was simply construing the plan, which it had power to do both under Section 77, sub. f above, and under its Consummation Order and Final Decree.

█ The second of these is that the district court lacked the power to disregard the regulatory laws of Massachusetts re-

lating to curtailment of service. Insofar as this argument is premised on the contention that the district court was enlarging or changing the plan, rather than merely construing it, it has been answered above. To the extent that the argument rests on the theory that state laws are to be complied with in arriving at a plan, we have answered it adversely in In re New York, New Haven & Hartford R. Co., supra.

Finally, appellant argues that the court was without jurisdiction of it, but this argument is also based on the contention that the district court was enlarging, and not construing, the plan, and without merit for the reasons above stated.

Order affirmed.

CLARK, Circuit Judge, dissents in separate opinion.

CLARK, Circuit Judge (dissenting).

Had my brothers affirmed upon the available, but narrow, ground of appellants' failure on the present record to show any interest justifying the appeal, I should have been inclined to have quieted my doubts for the time being. But when they accept to the fullest extent possible appellee's interpretation of the reorganization plan as accepted below, and go on to find it plainly correct and otherwise beyond possibility of question, I think something more should be said lest this—to my mind—delusive air of certainty should prove misleading to the many interests involved in the reorganization and vastly affected by such a holding. Such other interests have not been heard in this matter; at least until they are, I can hardly bring myself to believe that a plan with the history and purpose of this one can lead to the rather extraordinary conclusion now so strongly stated. For it now appears that, notwithstanding the carefully formulated devices worked out after years of effort to remove the crushing burden of the Old Colony from the system as a whole, a new management has the power at will to continue that burden, for the benefit of local Boston commuters, to the tune of a truly staggering loss of $3,848,484.62 for one year alone. Even stranger is the concept that merely

because of a judicial reorganization one of the most regulated of industries becomes entirely free from regulation at a time when the public need is greatest.

Because of these grave doubts, and because, after all, this proceeding is actually brought as a part of the original proceedings in reorganization under the jurisdiction reserved in the order confirming the plan, I would think the legally correct, as well as practically desirable, course with reference to an issue of such far-reaching importance was to return the case to the district court for a full hearing of all the parties, including certainly the present security holders and particularly the Interstate Commerce Commission as guardian of the public interest. Moreover, the interest of the Commonwealth of Massachusetts, while not here established, certainly lies pretty close to the surface, to be brought to the fore whenever it chooses. To date—except perhaps for a more general claim in their last step, their reply brief—appellants have rather carefully avoided any suggestion that the Commonwealth may wish to exercise its option to take over the Old Colony system at salvage value for public operation. One can of course understand why a state will not undertake such a solution, even though all signs indicate its necessity, before the compulsion becomes clear. Until it chooses to stand upon its option, however, I can see no standing in these appellants to appeal, since the plan cancelled all franchise obligations of the Old Colony. This means, too, that the district judge was not in error in refusing to recognize their claims to control the immediate operation of the road, so hastily and peremptorily expressed at a late moment on February 28, 1949. The Commonwealth's option, however, cannot be nullified by any action of the New Haven in either running or not running Old Colony trains. Hence it, too, should be heard along with the other vital interests referred to at a real full-dress hearing such as the circumstances require.

Since such a hearing is not to be had, I must perforce go on to elaborate my grounds for questioning the assertedly simple and obvious construction now accorded the plan. In what I shall say I am not assuming to put forward a final and definitive interpretation of the plan or answer to the problem; this should not be attempted until the other interests, particularly the I. C. C., have been heard from. But I am bound to state that the general circumstances tend to suggest a result contrary to that set forth in the opinions below and here. As I see it, the conclusion which has been reached rests almost wholly upon a logical or common-sense deduction that an "option" to discontinue operation in full must necessarily (because the greater includes the less) permit of partial operation. I do not regard the fragmentary quotations, out of context, from mainly hearsay recitals of past happenings as adding any material support to the conclusion. But if we go beyond the surface to challenge this bit of fireside logic and its premise of an "option," the history and past and present circumstances of the reorganization seem to me to point the opposite way. When to this is added the dilemma—not faced so far as I can discover in the opinions here—of holding a regulated business to be freed of all necessary regulation by the device of reorganization, we have pretty serious grounds for pausing before too ready acceptance of appellee's present claim.

Turning, therefore, to the provisions of the plan in the light of its history, I find nothing to indicate that anything short of complete abandonment of passenger service was ever contemplated by the I. C. C., the reorganization court, or the New Haven itself. Very early in the reorganization the court appointed a Committee of Experts to appraise the Old Colony, which even then was recognized as a dangerous burden for the New Haven to bear. After a study noteworthy for its completeness and impartiality the experts submitted a report from which, as the historian of the reorganization has told us, only one inference could be drawn: that the Old Colony could not be successfully operated as a passenger line without a serious drain on the resources of the New Haven. Sunderland, A Brief History of the Reorganization of the New York, New Haven & Hartford Railroad 43, 1948. Using this report as a basis for

determining whether there was any possibility that the Old Colony might be operated profitably, and thus that the unexpired term of its lease to the New Haven might have value, the district judge said: "Nor is there room for the contention that some modification or abandonment of operations, lying within the range of any reasonable possibility, might give positive value to the remainder of the term. This possibility was thoroughly explored through the studies of the property made by the Committee of Experts." In re New York, N. H. & H. R. Co., D. C. Conn. 30 F.Supp. 541, 547.

At this early date the conclusion appears to have been that retention of any part of the Old Colony's freight, as well as passenger, service, would be unprofitable and would be a burden on the New Haven. Later the amount of freight traffic increased enough to make desirable the retention of freight service, at least as a feeder for the New Haven's general freight business.

In its first report formulating a plan for the reorganization of the New Haven, the I. C. C. was unable to solve the problem of bringing in the Old Colony without casting too heavy a burden upon the lessee road, and hence it then made no provision for the Old Colony. When, however, it again took up the Old Colony problem later, it rejected the earnest contention that acquisition of the Old Colony by the New Haven should be made only on condition of the abandonment of passenger service. Instead it said: "The record, however, does not justify us in making it an immediate condition of the acquisition of the Old Colony properties and assets by the principal debtor under the plan of reorganization that passenger service on the Old Colony as a whole or in the Boston group be discontinued. * * * A further trial period, in which the efforts on the part of all concerned to improve the situation may be continued, is warranted in all the circumstances." First Supplemental Report, 244 I. C. C. 239, 264, 265. Hence it inserted in the plan a so-called "escape clause" intended to permit temporary continuance of Old Colony passenger service so long as the losses incurred were not too great.

Nevertheless, this "escape clause" met opposition from many quarters. Hence when the compromise committee, organized to settle the differences between the New Haven and the Old Colony, produced its controversial Joint Report, that report provided for acquisition of the Old Colony with a proviso similar to that of the final plan, allowing the New Haven to discontinue passenger service on the Old Colony if losses exceeded certain critical figures. The Commission's comments on this provision are instructive: "It is to be noted, moreover, that the proposed conditions are coupled with a proposal to operate passenger service, if and so long as the passenger losses therefrom do not exceed the critical figures. In this connection, it will be recalled that while we found that the acquisition of Old Colony properties and assets was justifiable, we based our finding upon the premise that the passenger losses of the Old Colony would be eliminated or largely reduced." Third Supplemental Report, 254 I.C.C. 63, 88.

The Commonwealth of Massachusetts objected strenuously to these provisions, and one of the proposals for modifying the plan which it made was to "permit no more discontinuance of passenger traffic on the Old Colony properties than is needed to reach the critical figures." Fourth Supplemental Report, 254 I. C. C. 405, 421. This was an endeavor to have the plan authorize exactly what the New Haven now claims it has discretionary power to attempt, i. e., to curtail passenger service until the losses are brought within reasonable limits, rather than discontinue it. But the Commission refused to accept this proposal. It said significantly: "It is likewise clear that to modify materially the provision of the Joint Report in respect of the Old Colony would be to nullify the compromise agreement reached after extended negotiations with little or no expectation that the suggested modification would prove acceptable to the interested parties." Id. at 422.

So the plan went through to consummation. There is more of the plan relevant to

our inquiry than is quoted in the majority opinion. Sec. N(2) (a) of the plan provides: "The charter of the reorganized company and of Old Colony shall be amended, and the franchises and statutory obligations of the reorganized company and of Old Colony shall be amended or superseded so that neither road will be under any obligation to operate passenger service on Old Colony lines. The reorganized company shall, however, undertake * * * a contractual obligation to operate for its own account passenger service on Old Colony lines if and so long as the losses therefrom do not exceed the critical figures provided below." While Sec. N(3) (a) provides that "passenger service on Old Colony's lines may be discontinued if during any of the periods described below passenger losses on Old Colony's lines shall exceed the critical figure at the time in effect." And that section goes on to give Massachusetts an option to buy the Boston-to-Braintree line for its salvage value if passenger service should be discontinued.

When these provisions are read in the light of the background stated and particularly the rejection of express provisions for the power now claimed by the New Haven, it is obviously difficult to accept the New Haven's present view that a complete abandonment of passenger service was not intended. Even the words used point to the decisive and—under the circumstances—clean-cut step. The word "discontinue" is defined by Webster's New International Dictionary, 2d Ed. 1939, as meaning " * * * to put an end to; to cause to cease; to cease using; to give up" —meanings quite other than the connotations implicit in the word "curtail," which it defines as " * * * to shorten; abridge; diminish; lessen; reduce." It goes on to give the meaning of "discontinue" at law as being "to abandon or terminate by a discontinuance"—an even more direct interpretation of the critical term. An interesting bit of support from the court itself for this view is found in Art. XI, s. 2(m), of the final Consummation Order and Decree, which reserved jurisdiction in the District Court: "To consider and act on any question respecting the 'Critical Fig-

ures' established by the Plan with respect to the termination by the Reorganized Company of passenger service on the Old Colony Lines." A "termination" is quite different from a "reduction."

In this light the provision substituting a contractual for a franchise obligation for the maintenance of Old Colony passenger service assumes understandable significance. A plan approved by the I. C. C. might properly provide for abandonment of service upon the happening of a stated event; the crucial factors of public interest have been weighed and evaluated just as they would be on a proposal for immediate abandonment, and only the final event, conclusively detrimental to the continuance of the road, is needed for operation of the announced step. Surely, however, no such consideration can properly apply to the substitution of a contractual undertaking so broad and general in its terms as to permit a railroad to cease, taper off, continue, or expand its operations at will. Should such a provision appear in even a fully consummated plan, I should think it still sufficiently unusual and vulnerable that its validity could not be considered conclusively determined. In this connection reference should be made to the New Haven's claim of "option" even when the critical figures of loss are reached. A choice between continuing or abandoning the service is a much more limited one than the wide authority to operate substantially at will here asserted. But there is, indeed, little to indicate that even this choice was contemplated in the plan. About the only thing looking in this direction is the provision as to the option, inserted as an afterthought on the state's insistence, giving Massachusetts the right to buy the Braintree line at salvage value in the event the passenger losses exceed the critical figure and as a result the road "shall elect" to discontinue the service. Definite interpretation of this might well await the clearer light of fuller discussion; meanwhile I apprehend that it does not contemplate anything as extensive as a purely discretionary power in the officers of the road to continue incurring these losses as they choose. The lines of the device to

be rid of the Old Colony had been firmly fixed before this appeared; at most it should permit the road to operate after the happening of the stated event only with the consent of the vitally interested parties and the representative of the public so long as losses stayed near the critical figure. Anything beyond this would again tend to nullify the plan. It was certainly never contemplated that the passenger service would be continued when the losses incurred were four and a half times as great as those specified as critical.

In reaching their differing conclusion, my brethren rely upon the circumstance that on a few occasions during this long reorganization the Commission or our court has spoken of a "curtailment of service" or of discontinuing passenger service "in whole or in part." Neither by themselves nor in their contexts do these offhand characterizations or references appear to me to support the inference sought to be drawn from them. Indeed several are only statements of contentions or arguments presented and without further significance. True, the word "curtailment" has occasionally been used; but it must be recalled that in the total picture of Old Colony service, complete abandonment of passenger trains is only a "curtailment," since freight trains are still to run. Thus it is that discontinuing passenger travel must be authorized by the I. C. C. under the bankruptcy power, rather than under its normal power over abandonment, since it constitutes only a partial abandonment. Moreover, no stress can properly be put on the Commission's statement early in the proceedings that the public was "alive to the danger that service may be discontinued, in whole or in part." 244 I. C. C. 239, 264. For this was soon after the time that the New Haven had been seeking a curtailment of Old Colony passenger service, rather than a discontinuance, in the form of its abortive attempt to close 88 passenger stations. The Commonwealth, various towns, and commuters groups had just finished fighting to prevent any curtailment of service, and were as aware of that as a danger as they were of discontinuance as a danger. See Rood, Protecting the User Interest in Rail-road Reorganization, 7 Law & Contemp. Prob. 495, 1940. It is a fact that as early as 1939 the New Haven trustees had tried to discontinue passenger service on the Boston Group of Old Colony lines, and the efforts of the reorganization judge were required to induce them to hold off on this move while a satisfactory compromise was sought. Id. at 502.

As a matter of fact, the New Haven itself has regarded the plan as calling for discontinuance of passenger service if the critical figures were exceeded. This is demonstrated by the fact that as late as February 9, 1948, it gave notice to the Massachusetts Department of Public Utilities of its intention to abandon passenger service as soon as the trial period provided in the plan had elapsed. The present attitude of the road represents a very obvious and very definite change in its position. Of course so far as that represents a proper exercise of managerial discretion, it is no concern of ours. But since that is the point at issue, and its solution remains a matter of the utmost concern at least to New England, if not to the nation, it seems proper to refer to the avowed purpose of the new management, installed since completion of the reorganization, "to take control from the outlanders of New York and Connecticut, and give the good people of Massachusetts an overdue break." Capture of the New Haven, Fortune 86, 89, April, 1949. However laudable this objective, the public interest will hardly be subserved by giving the people of Massachusetts a break which may well break the New Haven itself. "The general public interest of keeping an interstate railroad running must override the local public interest of Massachusetts if the Commission thinks the two incompatible." In re New York, N. H. & H. R. Co., 2 Cir., 147 F.2d 40, 51, certiorari denied Commonwealth of Mass. v. New York, N. H. & H. R. Co., 325 U.S. 884, 65 S.Ct. 1577, 89 L.Ed. 1999.

This balancing of conflicting interests cannot properly be left to the management of the New Haven. Nor, as Palmer v. Commonwealth of Mass., 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93, taught, can it be left to the discretion of the reorganization

court. See Meck and Masten, Railroad Leases and Reorganization: I, 49 Yale L.J. 626, 657, 658, 1940. This is the kind of question which is in the special competence of the Interstate Commerce Commission, and on which that body should be heard. And yet here all regulation is gone.· The District Court's order, now affirmed, has enjoined the Massachusetts commission from regulating what passenger service, if any, the New Haven shall give. The I.C.C. has not been heard. The District Court has not considered the proposed railroad operations on their merits, but has, inferentially at least, denied its power to do so. This great railroad system therefore now exercises a freedom from governmental regulation which must be unique in modern annals.

The New Haven has suggested in argument that the Boston commuters from Southeastern Massachusetts should be grateful for the service it continues to give them. Indeed they should, and that is a proper answer to the interests these appellants assume to represent. But it is decidedly not an answer to the broader proposition which I think we should find involved and should face. When the loss reaches immediately the figure of $3,848,484.62 as against the critical figure of $850,000 set by the plan, a continuance of operation would seem to point only to new insolvency and renewed proceedings in reorganization. Whether or not at this late date a mere modification of operation can spell a complete reversal of this dismal trend is of course beyond my power to divine. It has already been pointed out that the other forms of transportation in the area—the paralleling good highways, the rapid transit underground in Boston, with high speed trolleys and street railways connecting with motor bus lines—provide a complete network making railroad transportation no longer a necessity. See In re New York, N. H. & H. R. Co., D. C. Conn., 30 F.Supp. 541, 544–547. Weighing of the proper transportation values would seem properly the task of a regulatory commission. Complete freedom in the management to subserve local interests unduly may, however, quite conceivably spell the doom of the entire system.

I should add a word as to the power reserved to the court to resolve ambiguities in the plan. That usual and useful reservation can hardly go so far as to justify rewriting a fundamental feature of the plan; nor can it properly exclude appellate review. In common with my colleagues, I have the highest regard for the district judge and his patient and skilled execution of this difficult reorganization. But if there is any value in appellate review at all, it must be in the deliberative approach afforded on full records, briefs, and arguments, and not available to a district judge faced of an afternoon with a real crisis in railroading forced upon him by the precipitate and last-minute action of this commission. Moreover, in the lonely task of judicial adjudication, each of us must finally act as his own faculties demand.· I would reverse for the purposes indicated.