**Matter of The NEW YORK, NEW HAVEN & HARTFORD RAILROAD COMPANY, Debtor.**
**No. 16562.**

United States District Court
D. Connecticut.
May 29, 1958.

J. H. Gardner, Jr., New Haven, Conn., William T. Griffin, New York City, for petitioner.

George Fingold, Atty. Gen., Lowell S. Nicholson, Asst. Atty. Gen., Matthew S.

Heaphy, Asst. Atty. Gen., for the Commonwealth of Massachusetts.

Lewis E. Caplan, Caplan & Garvey, New Haven, Conn., James L. Highsaw, Jr., Mulholland, Robis & Hickey, Washington D. C., for Railway Labor Executives' Ass'n.

ANDERSON, District Judge.

Proceedings for the reorganization of the New York, New Haven, & Hartford Railroad Company were commenced in this Court on October 23, 1935. On March 6, 1944, following an original and six supplemental reports of the Interstate Commerce Commission, a plan of reorganization was approved by the Court, 54 F.Supp. 631, and in 1947 the Court entered a consummation order which became effective on September 18, 1947. The reorganization plan contained certain provisions[1] concerning the relationship between the reorganized debtor and the former Old Colony line which, prior to the reorganization, had been leased by the debtor. In the course of the reorganization the Trustees of the Railroad on June 1, 1936, disaffirmed the Old Colony lease under the authority of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. and operated the lines for the account of the Old Colony Railroad. On June 3, 1936, the Old Colony became the subject of reorganization proceedings. The reorganization plan for the New Haven Railroad provided for the acquisition by the debtor of the Old Colony lines on a tentative basis in the hope that the reorganized debtor could carry them; but, as a protection to the debtor, the duty to continue the Old Colony passenger service was subject to termination provisions on the happening of certain contingencies. All of these provisions concerning the Old Colony lines were designed to give recognition to the interests of the unorganized public making use of the Old Colony passenger service on the one hand, and the interests of the debtor's bondholders and creditors and the interests of the general public in the continuing solvency and survival of the reorganized debtor, on the other hand. In the course of the reorganization proceedings, it became clear that the obligation imposed upon the reorganized debtor to continue the operation of the Old Colony passenger line contained within it the potentiality of destroying the reorganized debtor and rendering the whole reorganization proceeding futile. The purpose behind the inclusion of Sections N(2) (a), (b) and (c) and N(3) (a), (b) and (c) was to provide means by which the reorganized debtor could be freed from the incubus of the Old Colony lines when and if, after the happening of either of the contingencies therein set forth, it considered itself in peril and unable to carry the Old Colony.

The first of these protective termination provisions was that the contractual obligation to operate passenger service on Old Colony lines should continue "if and so long as the losses therefrom do not exceed the critical figures provided below" (Sec. N(2) (a)); and "The critical figure for any 12 consecutive calendar months, all of which are within the period of 2 years following the consummation of the plan, shall be $850,000. The critical figure for any 24 consecutive calendar months, all of which shall be after the end of the 2 year period, shall be $500,000." (Sec. N(3) (a)). The second protective termination provision provided that the contractual obligation to operate Old Colony line passenger service would end if certain protective legislation had not been passed prior to the end of two years after the effective consummation date of the plan. (Sec. N(2) (a)).

The initial period for which a critical loss figure of $850,000 in any consecutive 12 months, the attainment of which would, under the terms of the plan, relieve the reorganized debtor of the duty to continue the operation of the Old Colony passenger lines, was October 1, 1947, through September 30, 1949. The

---

1.  Sections N(2) (a), (b), (c) and N(3) (a), (b) and (c), of the Plan of Reorganization (Exhibit A, attached).

first twelve months of that period showed a loss, based upon the segregation formula provided in the reorganization plan (Sec. N(3) (b)), of $3,848,484.62 or four and one-half times the critical figure. It is the position of the New Haven Railroad that the loss incurred in that period relieved it of any further contractual duty, imposed under Sec. N(2) (a) of the plan, to continue the operation of the Old Colony passenger lines and that, then and there, it acquired the right completely to discontinue Old Colony passenger service. The Railroad asserts that it still has that right and in principal reliance upon it, it gave formal notice on May 13, 1958 of such discontinuance. In 1949, however, the Railroad instead of exercising its full right to discontinue, ventured upon an experiment of curtailment in the interest of those using the passenger service and in the expectation that losses might thus be reduced to bearable proportions. The Commonwealth of Massachusetts initiated state proceedings to prevent curtailment. It was enjoined by this Court from continuing the state proceedings, and the Court of Appeals for the Second Circuit affirmed in the so-called Passenger Service Case, Commission of Dept. of Public Utilities v. New York N. H. & H. R. Co., 178 F.2d 559, holding, in effect, that the Railroad's right to discontinue included the right to curtail. Since that time the Railroad has maintained a reduced schedule of passenger service, but claims that the continuous losses endanger the solvency of the reorganized debtor. It, therefore, gave the notice of discontinuance to become effective June 1, 1958.

The Commonwealth of Massachusetts, having received a warning of such notice, threatened to institute state court proceedings to compel the New Haven Railroad to continue the operation of the Old Colony passenger service. On application of the New Haven Railroad, this Court on May 13, 1958, issued a temporary restraining order against Massachusetts state court and other court proceedings in this matter and an order to show cause was issued returnable on May 23, 1958, the hearing on which continued through May 27th. Notice was given by personal service on the Attorney General and the Secretary of the Department of Public Utilities of the Commonwealth of Massachusetts and by publication in a general circulation newspaper in Boston. Copies of the Railroad's May 13th petition and report were forwarded to the Interstate Commerce Commission by the Clerk of this Court.

The Commonwealth of Massachusetts and Railway Labor Executives' Association (the latter having been granted leave to appear and be heard as a party in interest in the show cause proceeding) raised certain questions of law as to the right of the New Haven Railroad to discontinue passenger service on the Old Colony line and the Railroad assumed the burden of going forward with evidence to show the absence of any equitable bar to the injunctive relief sought by it and the justification for such relief.

The principal legal contentions raised by the Commonwealth and the Executives' Association are: (1) that the court has no jurisdiction to hear the issues presented; (2) that the Railroad elected "to curtail" rather than "to discontinue" when its right to discontinue was established in the first critical period and thereby lost or waived its right to discontinue; (3) that the right to discontinue can be exercised only in the critical period in which the claim of loss has arisen; (4) that the Railroad's claim of right to discontinue after operating a curtailed service for over nine years is unreasonable as a matter of law; (5) that the Railroad could now have a right to discontinue only by showing a critical loss under the second (i. e. loss of $500,-000 in 24 months) critical period standard under the segregation formula, which the Railroad admits it cannot do as it did not keep records under the prescribed segregation formula after the first critical period; (6) that the right to discontinue cannot carry on beyond the ten year option purchase provision of Sec. N(3) (a); and (7) that the failure of

the Commonwealth of Massachusetts to pass the described legislation (Sec. N(2) (c)), while it terminated the Railroad's contractual duty to continue the passenger service, did not relieve it from showing losses as referred to in the first sentence of Section N(3) (a).

The legal questions raised will be discussed seriatim.

■ (1). On the issue of jurisdiction, it may be noted that jurisdiction was expressly reserved to this Court in Part XI, Section 2(d), (1), (m) and (q) of the Plan of Reorganization as follows:

"2. Reservation of Jurisdiction. The Court hereby reserves jurisdiction in respect of the following matters:

"(d) * * * to construe the Plan as to matters which may require construction, not dealt with in this order.

"(1) To consider and act in any matter arising out of the option granted in the Plan to the Commonwealth of Massachusetts, for the purchase of the so-called 'Boston Group Lines';

"(m) To consider and act on any question respecting the 'Critical Figures' established by the Plan with respect to the termination of the Reorganized Company of passenger service on the Old Colony Lines.

"(q) To take such further action as may be necessary to put into effect and carry out this order and the Plan and all other orders relative thereto heretofore entered by this Court, provided, however, that nothing in this Section 2 shall be construed as a reservation of jurisdiction to change the Plan or any of the rights vested thereunder or any of the rights of the holders of the new securities or persons entitled to receive them."

In addition to the powers specifically reserved, this Court has the general equitable powers of a bankruptcy court to carry out a plan of reorganization. Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct.

695, 78 L.Ed. 1230; the Passenger Case, Commission of Dept. of Public Utilities v. New York, N. H. & H. R. Co., 2 Cir., 178 F.2d 559, at page 565; Evans v. Dearborn Machinery Movers Co., 6 Cir., 200 F.2d 125; Shores v. Hendy Realization Co., 9 Cir., 133 F.2d 738.

■ (2). As to the Commonwealth's assertion that the right to discontinue established by the tremendous losses shown in the first critical period was forfeited by the action of the Railroad in attempting to carry a part of the burden of the Old Colony by curtailing the passenger service, it is the opinion of the Court that neither the history and purpose of the plan of reorganization nor the construction of it by the Court of Appeals in the Passenger Case, admits such construction. It is not questioned by the Commonwealth that the franchise duty of the Railroad to operate the Old Colony passenger service was dissolved by the reorganization. The only duty which the Railroad had to operate such service was a contractual one spelled out in the reorganization plan, and it was expressly subject to two conditions subsequent, upon the occurrence of either of which the duty was to terminate: namely, (a) losses exceeding the standard fixed for a critical period and (b) failure by Massachusetts to pass the legislation described in Sec. N(2) (c). The Court of Appeals' decision in the Passenger Case, in effect, decided that the right "to discontinue" included the right "to curtail" such service, which the reorganized debtor was attempting to do. Where toward the end of the majority opinion the words "could discontinue passenger service on the Old Colony division in whole or in part" are used, the history of the reorganization, the opinion of the trial court and the whole tenor of the discourse in the majority opinion of the Court of Appeals, demonstrate that the use by that Court of the disjunctive after the words "discontinue * * * in part" does not imply any permanent loss of power to adopt the alternative course of conduct to "discontinue * * in whole" at some later time. The Court

of Appeals in preceding portions of its opinion said, "the word 'discontinued' was thought from the beginning by all concerned to mean 'discontinued in part' or 'curtailed' as well as 'discontinued in its entirety'"; and that opinion also incorporated the substance of that portion of the opinion of Judge Hincks, then the trial judge, which said, "I * * * construe the plan to authorize, in the stated contingency, a curtailment, as well as a complete discontinuance of, Old Colony passenger service,—a discontinuance of some as well as of all"; and "under the axiomatic principle that the greater quantity includes the lesser, the language must be construed to sanction a discontinuance of *some* passenger service, i. e. a curtailment of such service" as well as a discontinuance in its entirety. The reorganized debtor, because of the fulfillment of the condition occasioned by the loss of $3,848,484.62 in the initial critical period, could curtail the Old Colony passenger service from that time on because it no longer had any contractual or other duty to continue Old Colony passenger service and had the right to discontinue such passenger service completely. The legal duty under the reorganization plan to furnish any passenger service at all was terminated. The Commonwealth, in effect, concedes that the duty to operate the passenger lines terminated and that the reorganized debtor had a right to discontinue such service after the initial critical period; but, because the Railroad failed at that time to exercise its right to discontinue the passenger service completely, a duty arose in the Railroad to continue the curtailed passenger service. But whether the curtailment be looked upon as a temporary or experimental venture to minimize, as much as possible, the hardship and inconvenience to those members of the unorganized public who were accustomed to use the Old Colony passenger service, or be regarded as a gradual or deferred discontinuance for the same reason, to be continued or terminated as future events might require, the partial operation of these passenger lines by the New Haven Railroad has been voluntary and has not constituted a waiver of its right to discontinue the operation entirely. Moreover, the notice given by the Railroad to the Commonwealth at the time of the commencement of the curtailed passenger service in 1949 makes it clear that it was not thereby relinquishing its right to discontinue such service altogether.

"These trains will continue to operate pending decision of the General Court of the Commonwealth on the purchase of the South Station property as recommended by the Special Commission. If this purchase is accomplished they will continue to operate thereafter as long as they show prospects of meeting out-of-pocket costs." Exhibit "A" of the Railroad's Petition dated March 1, 1949, in the Passenger Case.

The Railroad concedes, of course, as it must, that any injunctive relief necessary to implement the exercise of its legal right completely to discontinue the Old Colony passenger service is subject to any overriding equities which exist at the time of the notice of discontinuance in favor of the public. It claims, however, and has offered evidence to prove that the equities at the present, and, in fact since the effective date of the plan's consummation order, are and have been in favor of the Railroad. This factual issue is not now before the Court as the taking of evidence on it has not been completed.

█ (3). The Commonwealth claims that the Railroad's right to discontinue could be exercised only in the critical period in which the claim of loss had arisen is partly answered by the discussion under "(2)" above, in that once the contractual duty of the Railroad to operate the Old Colony passenger line was terminated because of great losses in a particular critical period, it cannot be said that the duty arose again simply because the Railroad did not wholly discontinue its operation during or at the end of that period.

The Commonwealth also predicates this claim upon the language of the first sen-

tence of N(3) (a), particularly the phrases "during any of the periods" and "at the time in effect". However, both in the context in which they are used and grammatically, "during any of the periods" modifies "shall exceed" and "at the time in effect" modifies "critical figure"; neither modify "may be discontinued" nor does either of those phrases or the whole clause, "if * * * in effect", place a limitation or restriction upon, or in any way fix the *time* of discontinuance.

The Commonwealth's argument on this point is also answered by the discussion under "(5)" infra.

■ (4). The Commonwealth also asserts that it is unreasonable as a matter of law for the Railroad to claim at this time a right to discontinue passenger service completely after operating a curtailed service for more than nine years. The question should be asked, however, "Unreasonable to whom?" It cannot be said to be unreasonable toward that portion of the unorganized public which uses the Old Colony passenger service for there is nothing in the record of the history of this case to indicate that it would have been better off with no service rather than the curtailed service. As was stated in the opinions in the Passenger Case, it was better to have some service rather than none. No claim has been made by the Commonwealth of any loss or damage which has been caused to anyone because a curtailed service was adopted when the Railroad might have discontinued the service altogether. Insofar as this question may invoke a claim of waiver or estoppel, I have, as just noted, heard no claim by the Commonwealth or anyone else of conduct on the part of the Railroad in reducing its passenger service under the circumstances of this case whereby any legal injury was caused another, nor did the Railroad through curtailing the passenger service do anything inconsistent with its right to discontinue the service completely, nor did the Railroad do anything to evince an intention permanently to give up its right to discontinue such service entirely.

The Commonwealth is saying that because the Railroad has voluntarily continued a reduced schedule for so long a time, a duty has now arisen as a matter of law requiring the Railroad to continue it indefinitely. No such conclusion is warranted. It may also be noted that the Commonwealth has had this same period of time within which to pass necessary legislation; but in spite of the tremendous loss incurred by the New Haven Railroad in operating the Old Colony passenger service in the initial critical period and in spite of the fact that the grave financial difficulties faced by railroads in furnishing passenger service in the intervening years have been a matter of common knowledge, of which the Court may take judicial notice, the Commonwealth has done nothing to give any of the relief plainly contemplated by the plan of reorganization.

(5). It is the Commonwealth's claim that the Railroad, having failed fully to discontinue at the time of the initial critical period, can discontinue after that only by showing a critical loss under a subsequent critical period of 24 months in which the measure of loss must be $500,000 or more. But the purpose of the reorganization plan in fixing and setting a separate standard for subsequent critical periods (i. e. after the initial critical loss period) was to provide an additional and continuing safeguard to the reorganized debtor in the event that during the initial critical period there was a profit or a breaking-even or a loss of less than $850,000, in any of which events discontinuance of the passenger service could not be invoked unless followed by a period in which the losses in a 24 month period were at least $500,000. There is nothing in the plan to suggest that the provision for a subsequent critical period was to be invoked where the critical losses had been reached several times over in the initial period.

■ (6). The Commonwealth also claims that the right to discontinue, if any, cannot remain operative beyond the

option period referred to in Sec. N(3) (a). The Commonwealth argues that any right to discontinue which may have been conditioned on losses or failure to enact legislation was terminated on September 18, 1957—a period ten years after the consummation of the plan and the termination of the option period. In making this contention, the Commonwealth relies in part on that portion of Sec. N(3) (a) of the plan, which provides for discontinuance "if during *any of the periods* described below" the loss shall exceed a certain amount. In the same section of the plan the option is limited to a "period of 10 years" after the consummation of the plan. The Commonwealth then argues that since this proviso is in Sec. N(3) (a) it must therefore be one of the periods embraced within the meaning of the phrase "periods described below", and thereby limits the right to terminate the passenger service to the period of the option. It is the position of the Commonwealth that the sole purpose of the option was to protect the Commonwealth in case there was a proper discontinuance and that there could, therefore, be no discontinuance when this protection was no longer operative.

The Commonwealth's contention on this point is without merit. It seems clear that in the conditional language in Sec. N(3) (a)—"if during any of the *periods* described below passenger losses on Old Colony lines exceed the critical figure * * * " the word "periods" refers to the two critical periods during which the different losses must be established. The evolution of the plan reinforces this conclusion. For the right to discontinue service in the event of critical losses was established by the Third Supplemental Report of October 6, 1942. It was the Fourth Report dated July 13, 1943, which incorporated the option. And as the Court of Appeals stated in the Passenger Case at page 565 of 178 F.2d:

"For this option was, as appellee has suggested, an afterthought of the Commission. That is to say, the option provision was inserted in the

plan after the New Haven's right to discontinue service had been fully crystallized."

Furthermore, the Commonwealth cannot now consistently argue that the ten year option period limited in time the right to discontinue, because the Commonwealth argued for a longer—either unlimited or 20 year—option period on the basis that "the right to curtail by giving up passenger service is *unlimited in time*. The burden to the Commonwealth will arise whenever this occurs." Once the ten year period was adopted, it must have been clear to the Commonwealth that there would be no option protection between the end of the ten year option period and "unlimited time" during which the right of the Railroad remained operative.

Moreover, any right to discontinue based on the failure to enact legislation could not, even under the Commonwealth's option period argument, be limited to the ten year period. The two year period during which the Commonwealth was obligated to enact legislation is provided for in the last sentence of Sec. N(2) (a) and could not be considered as "any of the periods described below" within the meaning of Sec. N(3) (a) for Sec. N(2) (a), of course, precedes Sec. N(3) (a).

For these reasons, it is concluded that the right to discontinue the Old Colony passenger service is not affected by the period limited for the option.

■ (7). Although the Commonwealth concedes that the failure by the Commonwealth of Massachusetts to pass the legislation described in Section N(2) (c) terminated the Railroad's contractual duty to continue the passenger service, it contends that the Railroad could take advantage of this termination of duty only in the event that it could show losses as referred to in the first sentence of Sec. N(3) (a). There is, however, nothing in the reorganization plan which makes such termination of duty contingent upon a showing of operation losses where Massachusetts has failed to

pass the legislation described. The relationship between those two provisions is shown in Sec. N(2) (a).

"It [the reorganized debtor] shall further undertake a contractual obligation to operate for its own account passenger service on Old Colony lines if and so long as the losses therefrom do not exceed the critical figures provided below. These agreements shall take the form of a stipulation by the reorganized company before the court. The contractual obligation to operate passenger service shall terminate if legislation described below in (c) has not been passed prior to the end of 2 years after consummation of the plan."

Had the critical loss provision followed the sentence concerning the legislation to be passed, there perhaps might be some room for the Commonwealth's argument, but the sentence concerning the legislation to be passed comes after the sentence concerning the effect of critical losses and the form of the agreement. The concluding sentence of the paragraph concerning the legislation to be passed undercuts the entire contractual obligation to operate the passenger service; it is plenary and says unequivocally "the contract obligation * * * shall terminate if legislation * * * has not been passed * * *." The first sentence of Sec. N(3) (a) is what is referred to in the part of Sec. N(2) (a) which reads, "* * * the critical figures provided below", and is incorporated into it by the reference, so that for purposes of construction the Sec. N(3) (a) provision as to critical loss periods comes before the provision concerning the failure to pass legislation.

The Commonwealth also insists that if the failure of the Commonwealth of Massachusetts to pass the required legislation had the effect of completely relieving the Railroad of its duty to continue the Old Colony passenger service, the Court of Appeals would have said so in its decision in the Passenger Case; but the Court of Appeals did not do so because at the time the case was heard and the record was made in the trial court, the two year limitation period for the passage of such legislation had not expired and that aspect of the case was never before the Court of Appeals.

The Commonwealth in raising and arguing the foregoing questions of law was joined by the Executives' Association which agreed in all respects with the position taken by the Commonwealth. The subject matter dealt with in the questions raised and in the discussion of them over-lap and to a large extent are intertwined.

A portion of the colloquy between the Court and counsel at the hearing brings into focus the nub of the contention of the Commonwealth and the Executives' Association.

"The Court: The reorganization took away the charter or franchise obligation, as you just said; is that right?

"Mr. Nicholson: Yes.

"The Court: The failure to pass the legislation removed the contract obligation?

"Mr. Nicholson: Correct.

"The Court: Now on what do you base the claim of right which had the correlative duty in the Railroad to operate the Railroad (i. e. the Old Colony passenger service)? It is not based on the charter or franchise. It is not based on a contract. What is it based on?

"Mr. Nicholson: The first sentence in paragraph (3) of Section N.

"The Court: And that is what you stand on?

"Mr. Nicholson: That is correct.

"The Court: Mr. Highsaw.

"Mr. Highsaw: Your Honor, I am not going to burden you by re-treading the legal ground covered fairly fully by other counsel. We concur in the position of the Commonwealth that the Railroad must comply with the critical figure provisions of the plan as a condition

precedent to discontinuance of the service."

Thus the real question raised is the construction and effect in the context of the reorganization plan of the first sentence of Sec. N(3) (a) which is:

"Passenger service on Old Colony's lines may be discontinued if during any of the periods described below passenger losses on Old Colony's lines shall exceed the critical figure at the time in effect."

The seven questions of law set out above are all facets of this one question. The contentions of the Commonwealth and the Executives' Association as to the interpretation and meaning of the quoted sentence, in itself and in relation to the other provisions of the plan, have been sufficiently discussed in connection with the seven questions of law. These claims by the Commonwealth and the Executives' Association are rejected and the Court rules that the reorganized debtor, the New Haven Railroad, has the present legal right to discontinue the passenger service on the Old Colony lines.

The permanent and final injunctive relief sought by the Railroad cannot now be granted as the Court must first determine whether there exist any overriding equities which bar such an injunction.

As previously stated the Railroad has assumed the burden of going forward with evidence to show that there exist no equitable considerations which would bar such relief and that, on the contrary strong equities exist which entitle the Railroad to it. The motion by the Commonwealth to strike this evidence is denied. There will be afforded an opportunity for the Railroad to present additional evidence on this question, if it chooses to do so, and an opportunity for the parties in interest to cross-examine the Railroad's witnesses and present evidence of their own on the same issue. The effect of the decision on the questions of law in favor of the Railroad renders it unnecessary to rule on the Railroad's claim that, its present right to discontinue Old Colony Passenger service

entirely, can also be shown by evidence of losses in excess of $500,000 for every 24 months period in the years 1949–1957 by proof of such a nature as to make it definitely certain that an accounting under the reorganization plan's segregation formula, would have shown a loss in excess of $500,000 for any such period, even though the segregation formula was not in fact used. That claim is not now ruled upon nor will evidence be received at the continued hearing in support of or in opposition to any issues raised by it.

The continued hearing relating solely to equitable considerations affecting the issuance of the permanent injunction sought by the Railroad will be resumed on June 23, 1958, at 10:30 a. m., E.D.S.T., in the United States District Court at New Haven, Connecticut.

The Commonwealth has filed a petition for an injunction to prevent the Railroad from discontinuing Old Colony line passenger service on June 1, 1958.

In view of the unfinished hearing and the time required by the parties to prepare for it, and in view of the confusion and disruption which would be caused by proceedings which might be instituted by the Commonwealth or others in other courts or before administrative bodies, and by the complete discontinuance of Old Colony Passenger service before the issue of permanent injunctive relief was fully resolved and for the purpose of meanwhile preserving the status in quo, temporary injunctions will issue against the Department of Public Utilities of the Commonwealth of Massachusetts and other persons named or referred to in paragraph numbered (1) in the restraining order issued by this Court in this case on May 13, 1958 and against the New York, New Haven and Hartford Railroad Company.

It is therefore ordered:

1. That the Department of Public Utilities of the Commonwealth of Massachusetts, the Attorney General of said Commonwealth, and all other persons wherever situated, located and domiciled

be and they hereby are temporarily enjoined, pending further order of this Court, from interfering with The New York, New Haven & Hartford Railroad Company through the institution of any proceedings in any court other than in this Court (and in this Court otherwise than in the proceedings now pending herein), and from interfering by administrative action or otherwise, for the purpose of preventing or delaying final and total discontinuance of passenger service upon the former lines of the Old Colony Railroad Company pursuant to the plan of reorganization herein.

2. That The New York, New Haven & Hartford Railroad Company be and is hereby temporarily enjoined from discontinuing the presently existing schedule of passenger service on the former lines of the Old Colony Railroad until further order of this Court.

3. That the Clerk of this Court be and he hereby is directed to immediately transmit three certified copies of this order to the United States Marshal for the District of Massachusetts who pursuant to the general orders in bankruptcy, is directed forthwith to serve the same upon the Department of Public Utilities of the Commonwealth of Massachusetts, or upon its Chairman or Secretary, and upon the Attorney General of the Commonwealth of Massachusetts, and the Clerk be and hereby is further ordered to transmit immediately two certified copies of this order to the United States Marshal for the District of Connecticut who pursuant to the general orders in bankruptcy is directed forthwith to serve the same upon the attorney for the Railway Labor Executives' Association and upon The New York, New Haven & Hartford Railroad Company; and said Clerk is directed to forward a certified copy of this order to the Interstate Commerce Commission.

### EXHIBIT A

### Section N

"(2) (a) The charter of the reorganized company and of Old Colony shall be amended, and the franchises and statutory obligations of the reorganized company and of Old Colony shall be amended or superseded so that neither road will be under any obligation to operate passenger service on Old Colony lines. The reorganized company shall, however, undertake a contractual obligation to operate, for its own account and sole benefit, freight service on the Boston group until such time as it shall acquire the assets and franchises of that group. It shall further undertake a contractual obligation to operate for its own account passenger service on Old Colony lines if and so long as the losses therefrom do not exceed the critical figures provided below. These agreements shall take the form of a stipulation by the reorganized company before the court. The contractual obligation to operate passenger service shall terminate if legislation described below in (c) has not been passed prior to the end of 2 years after consummation of the plan.

"(b) The reorganized company shall not be obligated to acquire the assets and franchises of Old Colony's Boston group along with the Old Colony's other assets upon the consummation of the plan, but shall have the right without the payment of further consideration on its part to acquire such assets and franchises at, or at any time after, the consummation of the plan. Until such acquisition, the assets and franchises of the Boston group shall remain in Old Colony, the stock of Old Colony shall be reduced to equal in par value the net salvage value ($2,328,-895) of the assets in the Boston group, and the reduced stock shall be held by one or more trustees appointed by the court for the benefit of the holders of Old Colony's bonds (including its banks) at the date of the consummation of the plan. At any time, such trustee or trustees shall, upon demand of the reorganized company, convey to it the assets and franchises of the Boston group or, at the option of the reorganized principal debtor, the reduced Old Colony stock held by them.

"(c) The foregoing parts (a) and (b) are subject to the proviso that if the Legislature of Massachusetts shall amend

the charter of the reorganized company so that it will be under no charter obligation to operate passenger service on Old Colony lines, and provide that such service shall be operated only by virtue of, and in accordance with, the agreement referred to in (a) above, or shall by legislation provide equivalent protection (such as that resulting from the formation of a transportation district to take over the passenger service on the Boston group), then, upon consummation of the plan, if such legislation bé passed prior thereto, or upon the passage of such legislation within 2 years after the consummation of the plan, the Boston group shall be acquired by the reorganized company.

"(3) (a) Passenger service on Old Colony's lines may be discontinued if during any of the periods described below passenger losses on Old Colony's lines shall exceed the critical figure at the time in effect. The critical figure for the initial critical period which shall comprise the 2 years following the consummation date or January 1, 1946, whichever shall be the later, shall be $850,000 for any 12 consecutive calendar months falling wholly within said initial critical period. The critical figure for any 24 consecutive calendar months, all of which shall be subsequent to the initial critical period, shall be $500,000. In the event that passenger losses on Old Colony's lines shall exceed the critical figure at the time in effect, and if as a result thereof the reorganized principal debtor or the Old Colony shall elect to discontinue passenger service on Old Colony's line, the Commonwealth of Massachusetts shall have the option of purchasing that portion of the Boston group lines extending from Boston to Braintree at the salvage value thereof which has been accepted for the purposes of the plan (the proportion of $2,328,895, the salvage value of the entire Boston group lines estimated in 1939, applicable to the Braintree branch), plus the depreciated amount of capital improvements made

since the date of the appraisal, said option, however, to be limited to such facilities appurtenant to said Boston-Braintree segment as shall reasonably be required by the Commonwealth of Massachusetts for its passenger operation and subject to a right in the reorganized company or in the Old Colony, as the case may be, to make joint use of such of said facilities as are not reasonably required for the exclusive use of the Commonwealth of Massachusetts; provided, however, that such option shall be valid only for a period of 10 years after the consummation of the plan; and provided further that in the event the Commonwealth of Massachusetts shall exercise the option provided herein, the reorganized principal debtor and the Old Colony shall so far as possible accord to the Commonwealth the right to use the Boston Terminal Company property on the same terms and conditions as possessed by the reorganized principal debtor and the Old Colony. Full jurisdiction shall be reserved to the court to determine at the appropriate time, if future controversies should arise, what facilities are in fact reasonably needed for such passenger operation by the Commonwealth and the salvage value thereof as established by the method indicated in the subsection of the plan, and to enter any and all appropriate orders in the premises.

"(b) As a basis for determining whether or not the critical figure in effect at the time is being met, the reorganized company shall keep monthly figures of the amount of passenger loss on Old Colony lines. Those figures shall be based upon the application of the segregation formula as approved by this Commission and the court in this proceeding, and the further apportionment of Old Colony's revenues and expenses between passenger and freight service under the general principles of this Commission's prescribed rules for separating common revenues and expenses between passenger and freight service, modified where nec-

essary to be consistent with the apportionments made in the segregation formula and in the light of data reasonably available for such separation. The formula for this computation is annexed hereto as Exhibit A. The result of such computation shall determine whether or not the critical figure has been met, unless the Department of Public Utilities of Massachusetts shall deem the Commonwealth or the public aggrieved by a proposed discontinuance of passenger service on Old Colony lines pursuant to the authority contained in the plan and claim that the computations of the reorganized company are inaccurate; in which case it may apply to the District Court for the District of Connecticut for the appointment of a master to audit such computations. The result of such audit shall in all respects be given the same effect as the report of a special master. In such case, whether or not the critical figure has been met shall be determined by the computations as the same may be modified in such proceedings.

"(c) In the event that on appeal from an order of court approving this plan any feature of section N(2), (a) to (c), inclusive, or of Section N(3), (a) and (b) shall be held to be illegal or inappropriate for judicial approval, if not inconsistent with the appellate mandate, the court may thereupon delete from this order (a) the feature or features thus disapproved and (b) all provisions relating to the acquisition by the principal debtor of the property and assets of the Old Colony, whereupon this order as thus modified may be deemed to state a separate plan for the reorganization of the principal debtor together with the Hartford & Connecticut Western and the Providence, Warren & Bristol or, if its provisions for the acquisition of the Old Colony shall not have been so deleted, as a more comprehensive plan to include the acquisition of the Old Colony as well, upon the terms of the order thus modified."